**ROCHESTER GAS AND ELECTRIC CORPORATION, Plaintiff-Appellant,**

v.

**PUBLIC SERVICE COMMISSION OF the STATE OF NEW YORK, Defendant-Appellee.**

**No. 309, Docket 84–7562.**

United States Court of Appeals, Second Circuit.

Argued Oct. 29, 1984.

Decided Jan. 29, 1985.

---

Richard N. George, Rochester, N.Y. (Robert L. Daileader, Jr., Timothy J. Simpson, Nixon, Hargrave, Devans & Doyle, Rochester, N.Y., of counsel), for plaintiff-appellant.

Lawrence G. Malone, Albany, N.Y. (David E. Blabey, Albany, N.Y., of counsel), for defendant-appellee.

Before FEINBERG, Chief Judge, and MANSFIELD and MESKILL, Circuit Judges.

MESKILL, Circuit Judge:

Appellant Rochester Gas and Electric Corporation (RG & E) appeals from a final judgment of the United States District Court for the Western District of New York, Telesca, J., dismissing RG & E's complaint pursuant to Fed.R.Civ.P. 12(b)(6). In its complaint, RG & E seeks a declaratory judgment that the New York Public Service Commission's (PSC) policy of including an estimate of RG & E's wholesale electric sales in RG & E's revenue base violates the Supremacy Clause, art. VI, cl. 2, and Commerce Clause, art. I, § 8, cl. 3, of the United States Constitution. The district court granted PSC's motion to dismiss, concluding that PSC's policy neither infringes on exclusive federal jurisdiction nor burdens interstate commerce. On appeal, RG & E challenges both conclusions. For the reasons that follow, we affirm.

## BACKGROUND

RG & E is a New York corporation engaged in the generation, transmission, distribution and sale of electricity in a nine county area surrounding Rochester, New York. PSC is an administrative agency of the State of New York, authorized, *inter alia*, to establish the intrastate rates charged by regulated gas and electric utilities. N.Y.Pub.Serv.Law, Art. 4. The great majority of RG & E's revenue is derived from retail sales, which are intra-

state and thus subject to regulation by PSC. In addition, RG & E makes sales of electricity for resale, also called wholesale or incidental sales. These sales are considered interstate and are subject to regulation by the Federal Energy Regulatory Commission (FERC).[1]

The facts giving rise to the present dispute between RG & E and PSC are undisputed and relatively uncomplicated. On August 27, 1982 RG & E filed proposed tariff changes with PSC. PSC suspended the proposed changes and conducted eleven days of hearings on the changes over a four month period. On July 18, 1983 PSC issued its decision which authorized a $7,805,000 increase in electric rates.

In reaching its decision, PSC used a "fully forecasted" rate year as its ratemaking method. Under this method, PSC forecasts the utility's expenditures and its revenues absent a rate increase for a twelve month rate year. Based on the projected expenditures and revenues, PSC adjusts the utility's rates so that if all goes as planned the utility will earn its authorized rate of return.

Using this method, PSC concluded that RG & E needed $470,603,000 in total revenue to earn its authorized rate of return. In determining the retail rates necessary to achieve this figure, PSC imputed $36,662,000 in revenues from estimated incidental sales into RG & E's revenue base. In explaining the imputation of incidental sales, PSC stated:

And, of course, we are not setting rates for those sales but merely reflecting a reasonable profit on a portion of those sales in rates which we do set.... [T]he Federal Power Act has indeed preempted state regulation of sales for electricity in interstate commerce ... but [it] in no way prohibits our action here, where we

---

1. The interstate character of incidental sales was conclusively established in *FPC v. Florida Power & Light Co.*, 404 U.S. 453, 92 S.Ct. 637, 30 L.Ed.2d 600 (1972). RG & E makes two types of incidental sales. The first type is made through the New York Power Pool, with the price determined under a formula approved by FERC. The second is made to a specific utility pursuant to a negotiated contract, which also must be approved by FERC. J.App. at 38–39.

are not regulating those sales but simply contemplating their being made.

Pub.Serv.Comm'n Op. No. 83–13 (July 18, 1983), *reprinted in* J.App. at 89, 98–99. After factoring in the $36 million in incidental sales, PSC concluded that RG & E's revenues would fall short of the $470 million revenue figure by $7.8 million and adjusted RG & E's retail rates accordingly.

RG & E sought a rehearing from PSC, claiming, as it had previously, that the imputation policy violates the Supremacy and Commerce Clauses. In rejecting RG & E's claims, PSC stated:

> Both the sections of the statute and the cases relied on by the company stand for the proposition that we lack authority to set rates for sales of electricity in interstate commerce—a proposition we do not deny. They do not, however, address the reflection of profits on those sales in the retail rates over which we do have jurisdiction. And as we said in Opinion No. 83–13, we have not regulated the sales at issue here but merely contemplated their being made.... The company's analysis notwithstanding, there is a distinction between, on the one hand, ordering sales for resale and, on the other, reflecting in jurisdictional rates the profits from a reasonably forecast level of those sales. Our use of a forecast test period requires us to do the latter as part of our effort to project expenses and revenues in the rate year, and including a reasonable level of sales for resale in the forecast in no way constitutes an order that the sales be made. Thus, the company has not shown that

the Federal Power Act is so broad that it applies to our actions here.

Pub.Serv.Comm'n Order Granting in Part and Denying in Part Petitions for Rehearing, *reprinted in* J.App. at 202, 206 (footnote omitted).

In April 1984, RG & E commenced the instant action. It seeks a declaratory judgment that PSC's policy of including an estimate of incidental sales in the total revenue figure is preempted by the Federal Power Act, Subchapter II (FPA), 16 U.S.C. §§ 824–824k (1982), and thus violates the Supremacy Clause, art. VI, cl. 2, and that the policy imposes an impermissible burden on interstate commerce and thus violates the Commerce Clause, art. I, § 8, cl. 3. The key to RG & E's claim is its argument that the inclusion of an estimate of incidental sales in the total revenue figure "compels" it to make those sales in order to remain whole and thus regulates those sales. In making its claim, RG & E does not challenge the reasonableness of PSC's estimate of incidental sales. For its part, PSC argues that although FERC's exclusive jurisdiction prevents it from "regulating" incidental sales, it may nevertheless take the existence of such sales into account when setting retail rates.

Based on its argument that "recognition" of incidental sales does not equal "regulation," PSC moved to have the complaint dismissed pursuant to Fed.R.Civ.P. 12(b)(6).[2] The district court found no conflict between PSC's policy and FERC's regulation of incidental sales and, given the admitted reasonableness of PSC's projection, questioned whether there was any compulsion under the policy.[3] Thus, it

---

**2.** PSC also sought to have the complaint dismissed on jurisdictional grounds. It claimed that the Johnson Act, 28 U.S.C. § 1342, deprived the district court of subject matter jurisdiction and that principles of comity and abstention required dismissal. The district court did not consider these arguments.

**3.** In questioning the compulsiveness of PSC's policy, the district court made an important observation.

> At oral argument of this motion, plaintiff's counsel conceded that the $36,680,000.00 projection of incidental sales was reasonable

based upon the information supplied to the Commission during the rate hearings. This removes from the case the possible argument that the Commission had set an unreasonably high level of incidental sales which was out of line with past experience and current data, in an effort to change RG & E's position toward interstate sales. In RG & E's reply letter-memorandum, the argument is made that in the future the level set by the Commission may grow to unreasonable proportions. At this time, however, it is undisputed that the projection is reasonable and future projec-

dismissed the Supremacy Clause claim. The court also concluded that the policy had no appreciable effect on interstate commerce since the estimated level of incidental sales "appears to be reasonable and will probably be achieved notwithstanding [PSC's] rate system." J.App. at 11. Thus, the court also dismissed the Commerce Clause claim. On appeal, RG & E claims that the court erred in both of its conclusions.

### DISCUSSION

#### I. *Supremacy Clause*

■ We agree with RG & E that the FPA has preempted state regulation of incidental sales of electricity. The Supreme Court has stated on numerous occasions that FERC, or its predecessor the FPC, has exclusive regulatory control over incidental sales. *See, e.g., New England Power Co. v. New Hampshire*, 455 U.S. 331, 340, 102 S.Ct. 1096, 1101, 71 L.Ed.2d 188 (1982) (the FPA delegated to FERC "exclusive authority to regulate the transmission and sale at wholesale of electric energy"); *FPC v. Southern California Edison Co.*, 376 U.S. 205, 215–16, 84 S.Ct. 644, 651–62, 11 L.Ed.2d 638 (1964) (FPA drew a bright jurisdictional line "by making FPC jurisdiction plenary and extending it to all wholesale sales" except those explicitly subject to state regulation); *United States v. Public Utilities Commission of California*, 345 U.S. 295, 311, 73 S.Ct. 706, 715, 97 L.Ed. 1020 (1953) (prior decisions of court left states no power to regulate wholesale sales; FPA established federal jurisdiction over such sales). Thus, if PSC is "regulat-

ing" incidental sales, its actions run afoul of the Supremacy Clause.

As alluded to earlier, the key to RG & E's argument that the policy is a form of regulation is its claim that the policy compels incidental sales. According to RG & E, the policy is a form of "economic coercion" because it forces RG & E to make the estimated level of sales in order to earn its authorized rate of return. This coercion, in effect, compels RG & E to make incidental sales. RG & E claims that by compelling incidental sales, PSC is regulating those sales.

■ As an initial matter, we, like the district court, question RG & E's claim that the policy "compels" it to do anything. RG & E does not contest the reasonableness of PSC's estimate. Rather, it objects to the policy in the first place, irrespective of the reasonableness of PSC's estimate of incidental sales.[4] Thus, we are not faced with a situation where a state commission has ordered a utility to begin making incidental sales or has made an unreasonably high estimate of incidental sales in an effort to force the utility to change its position toward such sales. Rather, based on RG & E-provided information, PSC has made a reasonable estimate of RG & E's incidental sales for the upcoming year. While it may provide some incentive to operate efficiently, we do not believe that PSC's recognition that RG & E will make incidental sales and its inclusion of a reasonable estimate of those sales in RG & E's revenue base materially affect RG & E's incidental sales decisions. Indeed, neither in its complaint nor in its brief does RG & E argue that but for the imputation policy it would engage in a lesser level of incidental sales.[5] Thus, we

tions will have to be dealt with in future cases.
J.App. at 13 n. 1.

**4.** Thus, it appears that RG & E would challenge the PSC policy even if PSC adopted RG & E's own estimates of its incidental sales for the upcoming year. For example, for the calendar year at issue, RG & E estimated that it would have 731,391 mwh available for incidental sales. J.App. at 100. Apparently, RG & E would object to PSC's use of the 731,391 mwh as its estimate.

In addition, it is worth noting that although PSC estimated that RG & E would have 1,220,-000 mwh available for incidental sales, it only imputed profits on 950,000 mwh in sales. *Id.* at 100–04. Moreover, for the 12 months ended March 1983, RG & E made 1,432,000 mwh in incidental sales. *Id.* at 104.

**5.** In fact, PSC claims that RG & E has consistently *exceeded* the projected level of incidental sales. J.App. at 104; Br. of PSC at 4, n. 3. Moreover, in paragraph 7 of its complaint, RG & E states:

do not believe that the policy "compels" incidental sales. With the element of compulsion eliminated, RG & E's argument that the policy "regulates" incidental sales fails.

This result is supported by decisions under the FPA and the analogous Natural Gas Act of 1938 (NGA), 15 U.S.C. §§ 717–717z (1982),[6] which allow FERC to take into account activities it cannot regulate in setting rates for activities that it may regulate. These decisions recognize that by considering nonjurisdictional activity in setting jurisdictional rates, FERC has not crossed the FPA's or the NGA's bright jurisdictional line and regulated nonjurisdictional activity. *See, e.g., FPC v. Conway Corp.*, 426 U.S. 271, 280, 96 S.Ct. 1999, 2005, 48 L.Ed.2d 626 (1976) (consideration of nonjurisdictional transactions in setting jurisdictional rates "would appear to be an everyday affair"); *FPC v. United Gas Pipe Line Co.*, 386 U.S. 237, 245, 87 S.Ct. 1003, 1008, 18 L.Ed.2d 18 (1967) (FPC "has the power to reduce cost of service, and hence rates, based on the application of nonjurisdictional losses to jurisdictional income"); *Panhandle Eastern Pipe Line Co. v. FPC*, 324 U.S. 635, 646, 65 S.Ct. 821, 827, 89 L.Ed. 1241 (1945) (*Panhandle I*) (while FPC "lacks authority to fix rates for direct industrial sales, [it] may take those rates into consideration when it fixes" jurisdictional rates); *Colorado Interstate Gas Co. v. FPC*, 324 U.S. 581, 603, 65 S.Ct. 829, 839, 89 L.Ed. 1206 (1945) (although FPC could not regulate the production and gathering of natural gas, it could recognize such expenses in setting rates); *Corning Glass Works v. FERC*, 675 F.2d 392, 395

(D.C.Cir.1982) ("[i]t is well settled that the Commission may consider nonjurisdictional activities and transactions" in setting jurisdictional rates); *Public Utilities Commission of Colorado v. FERC*, 660 F.2d 821, 826 (D.C.Cir.1981), *cert. denied*, 456 U.S. 944, 102 S.Ct. 2009, 72 L.Ed.2d 466 (1982) (Supreme Court has held on numerous occasions that FERC may consider nonjurisdictional items when setting jurisdictional rates).

These decisions are arguably distinguishable in that they involve the authority of the preempting agency, FERC, as opposed to the preempted agency, PSC. However, both inquiries involve the same examination of congressional intent. *See Arkansas Electric Cooperative Corp. v. Arkansas Public Service Commission*, 461 U.S. 375, 379, 103 S.Ct. 1905, 1909, 76 L.Ed.2d 1 (1983). As the Supreme Court has recognized, in enacting the FPA "Congress meant to draw a bright line easily ascertained, between state and federal jurisdiction." *FPC v. Southern California Edison*, 376 U.S. at 215, 84 S.Ct. at 651. However, the Court has also recognized that FERC's and the states' respective areas of jurisdiction were designed to coordinate with each other. *United States v. Public Utilities Commission*, 345 U.S. at 311, 73 S.Ct. at 715. Thus, in construing the analogous NGA, the Court has stressed that the legislation "does not contemplate ineffective regulation at either [the state or federal] level." *Panhandle Eastern Pipe Line Co. v. Public Service Commission of Indiana*, 332 U.S. 507, 520, 68 S.Ct. 190, 197, 92 L.Ed. 128 (1947) (*Panhandle II*). In the same opinion, the Court also stated:

---

7. The extent to which RG & E can make incidental sales at any particular time is governed by three factors: (1) the amount of electricity available for sale after satisfying the requirements of RG & E's firm customers, (2) the availability of a market for RG & E's electricity, and (3) the availability of transmission capacity to deliver the electricity to that market through the existing transmission system. J.App. at 62. If, as the complaint states, those three factors govern RG & E's level of incidental sales, it is difficult to see how PSC's policy alters that level.

6. The Supreme Court has stated that the relevant provisions of the Federal Power Act and the Natural Gas Act "are in all material respects substantially identical." *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 577 n. 7, 101 S.Ct. 2925, 2930 n. 7, 69 L.Ed.2d 856 (1981) (quoting *FPC v. Sierra Pacific Power Co.*, 350 U.S. 348, 353, 76 S.Ct. 368, 371, 100 L.Ed. 388 (1956)). Thus, the Court has an "established practice of citing interchangeably decisions interpreting the pertinent sections of the two statutes." 453 U.S. at 577 n. 7, 101 S.Ct. at 2930 n. 7.

The Act, though extending federal regulation, had no purpose or effect to cut down state power. On the contrary, perhaps its primary purpose was to aid in making state regulation effective, by adding the weight of federal regulation to supplement and reinforce it in the gap created by the prior decisions. The Act was drawn with meticulous regard for the continued exercise of state power, not to handicap or dilute it in any way.

332 U.S. at 517–18, 68 S.Ct. at 195–96 (footnote omitted).[7]

Thus, although the Court has emphasized that Congress drew a bright jurisdictional line between the reach of state regulation and the reach of federal regulation, it has also acknowledged that in regulating jurisdictional activity, nonjurisdictional activity may have to be accounted for and that this recognition of nonjurisdictional activity does not necessarily constitute regulation. In this respect, the Court's *Panhandle I* and *Colorado Interstate* decisions are illustrative.

In *Panhandle I,* the FPC allocated all profits from intrastate and interstate sales in excess of a six and one-half percent return to interstate operations and set interstate rates accordingly. Petitioner argued that by allocating intrastate profits to interstate operations the FPC has transgressed its jurisdictional line. Finding the intrastate sales to be incidental to the inter-

state sales and a segregation of costs impractical, the Court approved the FPC's actions. The Court stated that while the FPC "lacks authority to fix rates for direct industrial [*i.e.,* intrastate] sales, [it] may take those rates into consideration when it fixes the rates for interstate wholesale sales which are subject to its jurisdiction." 324 U.S. at 646, 65 S.Ct. at 827. The Court thus determined that although the FPC's duty to set just and reasonable interstate rates did not give it "authority to disregard the jurisdictional lines which Congress has drawn between interstate wholesale sales and direct industrial sales," this duty did permit the FPC to recognize and consider nonjurisdictional sales. 324 U.S. at 647–48, 65 S.Ct. at 827–28.

Similarly, the petitioner in *Colorado Interstate*

> argued that the Commission has no authority to include producing or gathering facilities in a rate base or to include production or gathering expenses in operating expenses. It is said that when the Commission follows that course, it regulates the production and gathering of natural gas contrary to the provisions of § 1(b) of the [NGA].

324 U.S. at 600, 65 S.Ct. at 838.

Based on its conclusion that the NGA empowered the FPC to follow "normal conventions of ratemaking," the Court rejected this argument. In so doing, the Court stated:

---

**7.** The regulatory gap referred to in *Panhandle II* was created by a line of Supreme Court decisions holding that the Commerce Clause prevented the states from directly regulating the interstate component of a public utilities business. The most important of these cases was *Public Utilities Comm'n v. Attleboro Steam & Electric Co.,* 273 U.S. 83, 47 S.Ct. 294, 71 L.Ed. 54 (1927). In *Attleboro,* the Court held that Rhode Island's regulation of the rates for wholesale sales between a Rhode Island utility and a Massachusetts utility was a direct regulation of interstate commerce and thus impermissible under the Commerce Clause.

In aid of its position on appeal, RG & E refers us to the Supreme Court's statement that Part II of the FPA "is a direct result of *Attleboro.* They are to be read together." *United States v. Public Utilities Comm'n,* 345 U.S. at 311, 73 S.Ct. at 715. RG & E uses the Court's recognition of the close relationship between *Attleboro* and congression-

al intent to support its claim that the FPA preempts PSC's policy. It argues that since regulation such as PSC's policy is impermissible under *Attleboro,* Congress, in filling the gap created by *Attleboro,* must have intended that such regulation be preempted by the FPA. In essence, the idea seems to be that action impermissible under *Attleboro* is necessarily impermissible under the FPA. Given the facts before us, we find this argument unpersuasive. PSC's policy has at most an incidental effect on interstate commerce and thus is valid under *Attleboro. See Attleboro,* 273 U.S. at 87–90, 47 S.Ct. at 295–296 (regulation of local rates having an incidental or indirect effect on interstate commerce is permissible). Therefore, even if we were to accept the idea that the preemptive effect of the FPA is simply a codification of *Attleboro,* our acceptance would not help RG & E.

Certainly [§ 1(b)] precludes the Commission from any control over the activity of producing or gathering natural gas. For example, it makes plain that the Commission has no control over the drilling and spacing of wells and the like. It may put other limitations on the Commission. We only decide that it does not preclude the Commission from reflecting the production and gathering facilities of a natural gas company in the rate base and determining the expenses incident thereto for the purposes of determining the reasonableness of rates subject to its jurisdiction.

324 U.S. at 602–03, 65 S.Ct. at 839.

Likewise, the FPA precludes PSC from regulating incidental sales. For example, it could not set rates for incidental sales or order RG & E to build more capacity in order to expand its level of incidental sales. However, once RG & E has determined that it will make incidental sales, PSC, in fulfilling its duty to set just and reasonable retail rates, may impute revenue from a reasonable estimate of RG & E's incidental sales into RG & E's revenue base. As PSC recognized, there is a distinction between, on the one hand, regulating incidental sales, and on the other, reflecting the profits from a reasonable estimate of those sales in jurisdictional rates.

In sum, because we do not believe that PSC's policy "compels" or "regulates" incidental sales, we affirm the district court's conclusion that the policy is not preempted by the FPA and does not violate the Supremacy Clause.

2. *Commerce Clause*

RG & E also claims that the imputation policy creates an unreasonable burden on interstate commerce in violation of the Commerce Clause. In advancing this claim, RG & E argues that the policy is either "direct" regulation of interstate commerce which is unconstitutional per se or "indirect" regulation which is unconstitutional because of the availability of an alternative that would satisfy the state purpose and yet have a less intrusive impact on interstate commerce.

The standards by which RG & E's Commerce Clause claim must be judged were set forth in *Arkansas Electric Cooperative Corp. v. Arkansas Public Service Commission*, 461 U.S. 375, 103 S.Ct. 1905, 76 L.Ed.2d 1 (1983). In *Arkansas Electric*, the Court stated that the modern trend in Commerce Clause cases is against the "supposedly precise division between 'direct' and 'indirect' effects on interstate commerce" and in favor of a balancing approach that looks "in every case to 'the nature of the state regulation involved, the objective of the state, and the effect of the regulation upon the national interest in the commerce.'" 461 U.S. at 390, 103 S.Ct. at 1915 (quoting *Illinois Natural Gas Co. v. Central Illinois Public Service Co.*, 314 U.S. 498, 505, 62 S.Ct. 384, 387, 86 L.Ed. 371 (1942)). The Court went on to explain that where a state "regulates even handedly to effectuate a legitimate local public interest, and [the] effects on interstate commerce are only incidental, [the regulation] will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Arkansas Electric*, 461 U.S. at 393–94, 103 S.Ct. at 1917 (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970) (citation omitted)).

■ Applying *Arkansas Electric* to the facts before us is relatively simple. As the Supreme Court has recognized, the states have a "vital interest[ ]" in regulating local utilities. *Panhandle II*, 332 U.S. at 521, 68 S.Ct. at 197. Moreover, economic protectionism, which is the "most serious concern" of the Commerce Clause, *Arkansas Electric*, 461 U.S. at 394, 103 S.Ct. at 1917, is not implicated by PSC's policy. Finally, it is questionable whether the policy affects, let alone burdens, interstate commerce. As previously stated, the imputed level of incidental sales is conceded to be based on a reasonable estimate of RG & E's future sales. Thus, as the district court recognized, there is no appreciable effect on interstate commerce because the estimated level of sales will probably be achieved notwithstanding PSC's policy. Therefore, because this policy fosters a

clearly legitimate local interest, does not implicate core Commerce Clause concerns and, if anything, indirectly encourages interstate commerce, we cannot say that it violates the Commerce Clause.

RG & E argues, however, that the policy must fail because there are alternatives that PSC could use which would create less of a burden on interstate commerce.[8] This argument fails for two reasons. First, as we have just concluded, PSC's imputation of a reasonable estimate of incidental sales does not burden interstate commerce. Second, the alternatives suggested by RG & E do not fully accomplish the local purpose. The main alternative suggested by RG & E is for PSC to set retail rates that guarantee RG & E its authorized rate of return regardless of the level of incidental sales. Then, after the incidental sales are actually made, PSC could use the fuel adjustment clause to pass along the profits from incidental sales to ratepayers. PSC rejected this "pay now, adjust later" method because it placed the entire risk of a shortfall in incidental sales on ratepayers. J.App. at 99. Moreover, because the "pay now, adjust later" method would guarantee RG & E its authorized rate of return solely from intrastate rates, it could discourage RG & E from making interstate sales and thus encourage inefficient utility operation by letting excess capacity sit idle. We cannot say that the availability of this alternative, "less intrusive" method requires us to hold that the imputation policy places an unreasonable burden on interstate commerce.

In sum, although PSC's imputation policy may create some incentive to make incidental sales, as long as the imputation is based on a reasonable estimate of RG & E's sales for the upcoming year, we do not believe that it violates the Constitution. RG & E's real quarrel with the policy appears not to be that the policy compels it to do something it has no desire to do, but rather that it does not want to bear any of the risk that for some reason actual incidental sales will be less than estimated. Neither the Supremacy Clause nor the Commerce Clause guarantees RG & E the risk free business environment that it obviously desires.

For the reasons stated, the judgment of the district court is affirmed.

---

**8.** The use of the fuel adjustment clause, deferred accounting, or periodic refunds are the alternative methods suggested by RG & E. Br. of RG & E at 6–7. It focused, however, on the fuel adjustment clause. Br. of RG & E at 27.