808 P.2d 592

In the Matter of the Adjudication of Alternatives to the Inventorying Ratemaking Methodology, and/or Plans for the Phasing in of Public Service Company of New Mexico's Excess Generating Capacity.

Public Service Company of
New Mexico, Applicant,

NEW MEXICO INDUSTRIAL ENERGY
CONSUMERS, Appellant,

v.

NEW MEXICO PUBLIC SERVICE
COMMISSION, Public Service
Company of New Mexico, Appellees.

In the Matter of the Adjudication of Alternatives to the Inventorying Ratemaking Methodology, and/or Plans for the Phasing in of Public Service Company of New Mexico's Excess Generating Capacity.

ATTORNEY GENERAL OF the STATE
OF NEW MEXICO, Appellant,

v.

NEW MEXICO PUBLIC SERVICE COMMISSION, Public Service Company of New Mexico and Southwestern Public Service Company, Appellees.

Nos. 18381, 18415.

Supreme Court of New Mexico.

Feb. 20, 1991.

Rehearing Denied April 10, 1991.

Tom Udall, Atty. Gen., Randall W. Childress, Deputy Atty. Gen., Gary Epler, Asst. Atty. Gen., Santa Fe, for Atty. Gen.

James C. Martin, Lee W. Huffman, Santa Fe, for New Mexico Public Service Com'n.

Keleher & McLeod, Richard B. Cole, Robert H. Clark, Kathryn J. Kuhlen, Albuquerque, for Public Service Co.

Hinkle, Cox, Eaton, Coffield & Hensley, Paul Kelly, Jr., Paul W. Eaton, Santa Fe, for Southwestern Public Service Co.

Margot Steadman, Albuquerque, for City of Albuquerque, N.M.

Campbell, Pica & Olson, Lewis O. Campbell, Wayne Shirley, Albuquerque, for New Mexico Indust. Energy Consumers.

## OPINION

BACA, Justice.

The attorney general and New Mexico Industrial Energy Consumers (NMIEC) ap-

peal from a final order issued by the New Mexico Public Service Commission (Commission) in its case No. 2146, Part II. The order has been reported as *In re Public Service Company*, 101 Pub.Util.Rep. (PUR) 4th 126 (1989) (hereinafter *Final Order*). In the original application for a hearing, the Public Service Company of New Mexico (PNM) sought authority to restructure certain aspects of its organization. It subsequently moved to withdraw its application. The Commission partially granted the motion to withdraw, but leave to dismiss the case in its entirety was denied. The case was retitled NMPSC Case No. 2146, Part II, and the scope of the hearing was redefined to be a consideration of alternatives to the inventory ratemaking methodology and of problems relating to the phasing in of PNM's excess generating capacity. Before this case commenced, the Commission docketed NMPSC Case No. 2087 (prudence case) to consider the prudence of PNM investment in the Palo Verde Nuclear Generating Station (PVNGS), the hearing on which was pending at the time of appeal. Subsequent to the filing of this case, NMPSC Case No. 2262 (rate case) was filed. The final order in this case in essence framed the issues to be considered in the rate case, which will determine the rates PNM may recover for its investment in PVNGS and other facets of the utility system.[1] The rate case includes the determination of how generating capacity will be phased into use and rates, or, as expressed by the Commission, "the *extent* to which it recovers a return *of* (capital) and *on* (profit) its investment."

The *Final Order*, 101 Pub.Util.Rep. (PUR) 4th at 131–40, summarizes the factual background and discusses the procedural history of this case. For the purposes of this appeal, it is sufficient to understand that PNM over the last several decades had invested in excess generating capacity, including portions of PVNGS. The Commission initially had addressed this problem through inventory ratemaking, *see New Mexico Indus. Energy Consumers v. New Mexico Pub. Serv. Comm'n*, 104 N.M. 565, 725 P. 2d 244 (1986), which allowed PNM to accrue carrying costs for its investment in capacity not yet needed by energy consumers. That stop-gap solution proved to be ineffective, leading the Commission to consider the problem anew.

This proceeding considered treatment of other capacity in addition to three units of PVNGS. This capacity includes: San Juan Unit 4 (SJ–4), the Southwestern Public Service Company (SPS) contract to supply power to PNM, the Los Alamos County (LAC) contract, and the Modesto, Santa Clara and Redding (M–S–R)[2] contract whereby M–S–R exercised its option to purchase 28.8 percent of SJ–4 in 1983, with PNM repurchasing 105 megawatts (MW) through 1995.

The final order terminated the Commission's inventory stipulation effective upon resolution of the rate case. The Commission determined that PNM could not recover its entire investment in all three units of PVNGS, excluding Unit 3 from rate base, and requested PNM to submit proposals for decertification and abandonment. The M–S–R contract was permanently excluded; 130 MW of SJ–4 were excluded from base rates until it is no longer a part of excess capacity; PVNGS Units 1 and 2 were included with the precise rate treatment reserved for the rate case subject to the prudence hearings; 147 MW of SJ–4, the SPS contract and the LAC contract all were

1. At the time this appeal was brought, both the prudence and rate hearings were pending before the Commission. Both hearings now have been held. Certain aspects of the prudence hearing are before this court in a separate appeal, and the order issuing from the final aspect of this trilogy, the rate hearing, has not been appealed. The Commission and PNM subsequently have presented argument asking us to take judicial notice of the two later hearings. We reject this request, because, although it would resolve the ripeness problem that we

discuss in this opinion, it would raise other questions regarding finality and the rules of appellate procedure. Essentially, if we chose to consider the results of the rate hearing—a case that was not appealed—to guide us through this case, we would be allowing a back-door appeal of that case.

2. M–S–R is a consortium of three California municipalities.

included in rates. *Final Order*, 101 Pub. Util.Rep. (PUR) 4th at 181–82.

The attorney general and New Mexico Industrial Energy Consumers (NMIEC) appeal from the final order. PNM has not appealed and along with the Commission has filed a brief in support of the order.

Appellants have raised many issues, claiming that aspects of the final order were not supported by substantial evidence, were arbitrary and capricious, exceeded the jurisdiction of the Commission, or violated the constitution. The attorney general claims that the Commission's determination that total exclusion of PVNGS would be unfair to the shareholders in PNM is unsupported by substantial evidence and is arbitrary and capricious and that the Commission's justifications for rejecting total exclusion of PVNGS were not supported by substantial evidence. NMIEC reiterates several of the attorney general's points and, in addition, argues that, in violation of state and federal statutory and constitutional mandates, the Commission exceeded its jurisdiction by removing power purchased from M–S–R from rate base. NMIEC additionally asserts that the Commission acted arbitrarily and capriciously, and without support of substantial evidence in adopting the mix of generating plants to be placed in rate base.

■ "This Court's role in reviewing orders of an administrative agency is to ensure that the order is neither arbitrary nor capricious, that the order is supported by substantial evidence, and that the order is within the agency's scope of authority." *Public Serv. Co. v. New Mexico Pub. Serv. Comm'n*, 106 N.M. 622, 626, 747 P.2d 917, 921 (1987). In order to fulfill our role, the issues also must be ripe for judicial review, with a final resolution of the relevant issues by the agency and with a concrete, developed factual record. *See Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *Midwestern Gas Transmission Co. v. FERC*, 589 F.2d 603, 617–18 (D.C.Cir.1978).

## I. DOES THE FINAL ORDER EXCEED THE COMMISSION'S JURISDICTION, VIOLATE THE SUPREMACY CLAUSE, OR VIOLATE THE COMMERCE CLAUSE?

NMIEC presents three issues regarding the scope of the Commission's ability to act. It argues that the Commission exceeded its jurisdiction granted by the New Mexico Public Utility Act, NMSA 1978, Section 62–6–4(B) (Repl.Pamp.1984), by excluding the M–S–R contract from rates. Should we find that the legislature intended to grant the Commission authority to exclude from rates a wholesale purchase, we are then asked to determine whether this conflicts with the Federal Power Act (FPA), 16 U.S.C. Sections 791a–825r (1988), and therefore violates the Supremacy Clause, U.S. Const. art. VI. If the FPA, however, does not apply to the M–S–R transaction, NMIEC presents us with a Commerce Clause issue, asking us to determine whether the final order unconstitutionally burdens interstate commerce in violation of U.S. Const. art. I, section 8, cl. 3.

Before we address these issues on their merits, it is helpful to consider exactly what the Commission did. As discussed earlier, it excluded the M–S–R contract from PNM's rates. M–S–R had exercised its option to purchase 28.8 percent of SJ–4 from PNM in 1983; as part of the agreement, PNM bought back 105 MW from M–S–R through 1995. At the hearing, PNM posited that the contract should be excluded from jurisdictional rates, and the Commission agreed, stating:

> We agree with the testimony of [a City of Albuquerque witness] that "[T]he M–S–R purchase is biggest now, 105 megawatts, precisely when PNM doesn't need the megawatts; and it disappears in 1995, precisely the time when PNM might be starting to need megawatts." This results in a mismatch between PNM's loads and resources. This is sufficient reason by itself to exclude the M–S–R Contract.
>
> Additionally, before 1995, the costs of PNM's owned portion of SJ–4 are less than the costs of the M–S–R Contract.

Good regulatory policy and the public interest require that if any portion of SJ–4 is to be paid for by PNM's ratepayers, it should be through direct inclusion in rate base of Company-owned resources rather than via the M–S–R purchase.

For all the above reasons, the M–S–R contract should be excluded from PNM's jurisdictional rates.

*Final Order,* 101 Pub.Util.Rep. (PUR) 4th at 177 (citations omitted).

### A. Does the Order Exceed the Commission's Jurisdiction?

■ The scope of the Commission's authority to regulate sales of capacity to PNM for resale is governed by Section 62–6–4(B), which states in pertinent part that such sales:

shall be subject to regulation by the commission but only to the extent necessary to enable the commission to determine that the cost to the utility of such * * * electricity at the place where the major distribution to the public begins shall be reasonable and that the methods of delivery thereof shall be adequate * * *.

NMIEC asserts that, by denying public access to the capacity, the Commission has attempted to regulate the purchase of electricity at the point of delivery to PNM rather than the cost at the point of distribution to the public. It contends that, because the capacity is not owned by PNM, the Commission's jurisdiction does not extend to its regulation and the Commission made no findings that would warrant an exercise of jurisdiction over the M–S–R contract.

Examination of what the Commission actually has done with regard to the M–S–R contract illustrates the flaw in this argument and requires us to uphold the exercise of jurisdiction. The Commission, by excluding the contract, did not attempt to regulate PNM's purchase of electricity— PNM's contract with M–S–R remains undisturbed by the Commission's actions. PNM simply cannot include the capacity in rates. The Commission, in other words, regulated the *utility* by excluding the contract; it made no attempt to regulate or interfere

with the contract to purchase. The general grant of jurisdiction to regulate a utility's rate and service contained in Section 62–6–4(A) provides the statutory authority for this action. The Commission's decision not to allow PNM to include the M–S–R contract in rates did not implicate Section 62–6–4(B)—there simply was no regulation of a sale of wholesale capacity—and we hold that the Commission acted within its jurisdiction.

### B. Does the Order Conflict with the FPA and the Supremacy Clause?

■ In *Public Utilities Commission v. Attleboro Steam & Electric Co.,* 273 U.S. 83, 47 S.Ct. 294, 71 L.Ed. 54 (1927), the Supreme Court established a bright line separating federal and state regulation— state regulation was limited to the retail sale of power, while the regulation of wholesale transactions was reserved exclusively to the federal domain. This bright line was codified in the FPA, 16 U.S.C. Section 824(a). Exempted from regulation, however, were municipalities, such as M–S–R. *See id.* § 824(f). NMIEC contends that regulation of the M–S–R contract falls within an area of exclusive federal jurisdiction and that the express exemption from regulation indicates the congressional intent that such contracts should remain unregulated and beyond the reach of state control.

We find it unnecessary to determine the legal issue of whether this is an area of exclusive federal jurisdiction, *cf. Arkansas Elec. Coop. Corp. v. Arkansas Pub. Serv. Comm'n,* 461 U.S. 375, 103 S.Ct. 1905, 76 L.Ed.2d 1 (1983) (allowing state regulation of rural electric cooperatives), because the Commission's activity regulates the retail sale of power. The Commission's actions constituted regulation of PNM and not of M–S–R. Exclusion of the contract in no way affected the municipalities' contract; it only affected PNM's ability to recover the cost of the contract from New Mexico consumers. Accordingly, we do not find that regulation of this type implicates an area of exclusive federal concern. *See Rochester Gas & Elec. Corp. v. Public*

*Serv. Comm'n,* 754 F.2d 99, 102–05 (2d Cir.1985) (state regulation that does not compel nonjurisdictional activity is not preempted and does not violate supremacy clause).

### C. *Does the Order Violate the Commerce Clause?*

■ NMIEC maintains that, having found that this was not an area of regulation reserved solely to the federal government, we must consider the implications of the Commission's regulation on the commerce clause, arguing that the exclusion of the M–S–R contract is "economic protectionism in its purest form" and therefore exactly the type of activity protected against by the commerce clause. *See City of Philadelphia v. New Jersey,* 437 U.S. 617, 623, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1977).

Two problems defeat NMIEC's argument. First, it is not clear that the Commission is regulating interstate commerce. It regulates the activities of PNM, an area incontrovertibly within its jurisdiction and sanctioned by the commerce clause. *See Panhandle E. Pipe Line Co. v. Public Serv. Comm'n,* 332 U.S. 507, 521, 68 S.Ct. 190, 197, 92 L.Ed. 128 (1947). The exclusion of the M–S–R contract does not directly affect M–S–R; it does not implicate its sales, or affect its decisions in a direct way. *See Rochester Gas & Elec. Corp.,* 754 F.2d at 102–03. The effect on interstate commerce thus cannot be outright protectionism or per se violative of the commerce clause—exclusion of the contract is not regulation directly implicating out-of-state interests. *Cf. Baldwin v. G.A.F. Seelig, Inc.,* 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032 (1935) (striking down as violative of the commerce clause New York's denial of a vendor license to a dealer procuring out-of-state milk at a price below the New York minimum fixed price).

The second problem is that the burden on interstate commerce, if there is a burden, could only be incidental to legitimate regulation of PNM. To determine whether the Commission's actions have impermissibly burdened interstate commerce, we apply the modern commerce clause balancing test articulated in *Arkansas Electric Cooperative Corp.,* 461 U.S. at 393–94, 103 S.Ct. at 1917–18:

> Where [a] statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

(quoting *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970)).

NMIEC argues that the regulation is not evenhanded—that the final order explains that M–S–R should be excluded over the San Juan capacity owned by PNM, giving precedent to sources simply by virtue of their local ownership. We disagree. The Commission articulated many legitimate reasons for excluding the contract, the most significant being that the contract provided power at a relatively higher rate at the time when it was least needed. The Commission excluded several sources of capacity, only one of which—the M–S–R contract—was owned by out-of-state interests. Moreover, the regulation directly implicated PNM, not M–S–R, and was part of the Commission's resolution of the legitimate and important concern of the excess capacity problem. The purpose of the regulation was not to exclude out-of-state capacity or to protect in-state generating capacity from out-of-state competition; the focus of the regulation was PNM, and it did not affect directly M–S–R or its marketing position. The contract is still intact, and any harm to M–S–R or any other interest seeking to sell power into New Mexico would be prospective. When the regulation is viewed in the context of its purpose, it is apparent that any prospective burden is highly speculative and ephemeral. This is not regulation

nefariously poised to protect local interests from interstate competition. It is regulation that, as soon as the excess capacity problem is resolved, will be without effect, even incidentally, on interstate commerce.

In addition to the regulation's rational goal—to deal with excess capacity—and its minimal impact on interstate commerce, we must consider the very important New Mexico interest in regulating utilities. *Cf. Maine v. Taylor,* 477 U.S. 131, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986) (overt discrimination against out-of-state interests upheld when balanced against highly significant state interest).

Thus, we conclude that exclusion of the M–S–R contract does not violate the commerce clause.

## II. DID THE COMMISSION PROPERLY CONSIDER FUEL MIX?

■ The Commission stated in its order that, in addition to reserve margin to insure sufficient availability of energy sources and the time required to construct alternative future sources, "[a]nother persuasive reason why all three units of PVNGS should not be excluded for jurisdictional use is fuel mix." *Final Order,* 101 Pub.Util.Rep. (PUR) 4th at 174. When it granted PNM's certificate of convenience and necessity to participate in PVNGS, the Commission stated that participation would allow a desirable mix of generating fuels. *See id.* at 174–75. In the order, it reaffirms that "[f]uel mix is important in minimizing the risk that some unanticipated event may adversely affect the price or supply of a single type of fuel." *Id.* at 175.

The attorney general's argument that the Commission erred by considering fuel mix fails to convince us that the Commission has acted improperly. Fuel mix considerations were not dispositive to the Commission's decision—they were cited as one further factor supporting the decision. Moreover, the Commission did rely on evidence in the record when it considered the effect of various mixes of generating fuels. Although the attorney general may not agree with the focus of the evidence, he did have the opportunity to present his own

evidence on the benefits, or lack thereof, of different fuel mixes. The attorney general relies on the naked assertion that: "[a] diverse fuel mix is a desirable goal only if it provides protection against rising costs." It is not apparent why this is true, or why the Commission could not, in its expertise and discretion, assign other values to the benefits of diversity, and we hold that the Commission's consideration of the effects of various fuel mixes was not error.

## III. ARE THE ISSUES RIPE FOR JUDICIAL RESOLUTION?

The Commission has directed us to consider the scope of the hearing at issue, examining its decision in the final order to determine exactly which issues this inventory case finally resolved and which this case considered as only threshold determinations with final resolution deferred to the prudence and rate cases. This is an essential concern of the ripeness doctrine, and we consider it a point well taken with regard to many of the issues before us.

■ "[A]n appellate court will not review the proceedings of an administrative agency until the agency has taken final action." *Harris v. Revenue Div. of Taxation & Rev. Dep't,* 105 N.M. 721, 722, 737 P.2d 80, 81 (Ct.App.1987). In this case, of course, the Commission has issued its final order. However, as is apparent from examination of many of the issues raised here, a final order is not necessarily determinative of whether final action has been taken. The determination of finality must be based on pragmatic consideration of the matters at issue and analysis of whether the administrative body has in fact finally resolved the issues. *See Abbott Laboratories,* 387 U.S. at 149–51, 87 S.Ct. at 1515–17. In this context, the Commission's admonition that we should closely examine which issues it decided and which it reserved for later consideration in the two sibling cases has raised significant issues regarding the role of this court in reviewing administrative activity.

"The basic purpose of ripeness law is and always has been to conserve judicial machinery for. problems which are real and

present or imminent, not to squander it on abstract or hypothetical or remote problems." 4 K. Davis, *Administrative Law Treatise* § 25.1 (2d ed. 1983). In *Abbott Laboratories*, the Court explained the basic rationale of the ripeness doctrine as being:

> to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties. The problem is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.

387 U.S. at 148–49, 87 S.Ct. at 1515–16.[3]

 Thus, several issues of direct relevance to this appeal are raised. We must determine whether certain issues will be revisited by the Commission in its subsequent hearings and thus should be reserved for its initial discretionary determination. Our analysis involves whether further fact finding by the Commission will elicit more evidence illuminating the issues, whether further agency decisions may moot some of the contentions, and whether the parties will suffer imminently the effects of the final order. The ultimate question, however, is whether agency action is sufficiently final or definitive so that there is no judicial interest in awaiting a more concrete formulation of the issues. *See Midwestern Gas Transmission Co.*, 589 F.2d at 618. We will not wait for the Commission's final decision if the issue will return to us without alteration. One factor that weighs heavily on our resolution of these issues is what the Commission has said it has done and will do. *See id.* at 620. Because of the Commission's great discre-

tion in initially determining the issues before it, *see Attorney General v. New Mexico Pub. Serv. Comm'n*, 101 N.M. 549, 553, 685 P.2d 957, 961 (1984), we believe that, if it reasonably states that it has not finally resolved an issue or will return to it, it should be allowed the opportunity to exercise its discretion.

Prefacing its discussion of the statement of the law in the final order, the Commission stated:

> In determining the law that applies to the circumstances of this case, we have kept a paramount fact in mind (of which we were called upon with some frequency to remind the participants): This is neither a prudence nor a rate case.
>
> As the caption to this case clearly shows, this proceeding is limited to the adjudication of alternatives to the Inventory ratemaking methodology, and/or plans for the phasing in of PNM's excess generating capacity.

*Final Order*, 101 Pub.Util.Rep. (PUR) 4th at 144.

In its answer brief, the Commission described as a "key determination" in its resolution of the excess capacity problem "whether all or some portion of the excess capacity should be retained for use in the future, or whether it should be completely and permanently cut loose from Commission jurisdiction because such excess capacity is not presently needed by, and is too costly for, today's ratepayers." The final order, too, makes clear that in some ways the decision constituted a threshold determination of what capacity would not possibly be required to insure stability for New Mexico's energy future; inclusion in this sense did not indicate a determination that the capacity was needed immediately, but that exclusion and permanent loss of jurisdiction over the capacity would not be pru-

---

**3.** Review of the relevant statutory provisions indicates that our legislature, in a manner similar to Congress, was concerned that the Commission should be allowed to finally determine the issues before it. *Compare* NMSA 1978, Section 62–11–1 (Repl.Pamp.1984) (allowing review of final Commission orders) *with* 5 U.S.C. § 704 (1988) ("preliminary, procedural, or intermediate" action not generally subject to judicial

review until agency action is final). We also find that the concerns that judicial resources should be conserved and that administrative determinations should be free from judicial interference prior to final actions are relevant to our deliberations. Accordingly, we will apply the doctrine of ripeness as enunciated in the federal courts as guidance in our evaluation of the issues presented to us here.

dent. In essence, the Commission decided not to exclude permanently that capacity whose effect on rates appropriately yet may be considered in the rate case. *See Final Order*, 101 Pub.Util.Rep. (PUR) 4th at 175.

In the final order the Commission concluded that "the inventory stipulation should be terminated and [certain] capacity should be excluded from New Mexico jurisdictional rates." *Id.* at 178. It determined that the amount excluded was within its previously determined acceptable range, and that the exclusion of more "would not be in the best interests of either ratepayers or investors." *Id.*

The Commission finds that PVNGS Units 1 and 2 are not presently used and useful in rendering service to PNM's ratepayers, but that the exclusion of both these units should be rejected for the previously stated reasons [that the Commission is not bound solely by what capacity is now used and useful; it must consider factors affecting financial health and balance investor and ratepayer interest]. This finding takes into account PNM's possible future load growth. The record in this proceeding, however, is not sufficient for the Commission to decide the rate treatment that will be applied to these units.

The forthcoming rate case will establish, in conjunction with [the prudence case], the valuation of generating capacity sources being added in base rates (PVNGS Units 1 and 2 and 147 MW of SJ–4) and the ratemaking treatment to be given these units. For example, it has been determined in this case that PVNGS Units 1 and 2 will be included in base rates, but it has *not* yet been determined whether these units will start recovery *of* investment immediately or whether the recovery *of* asset investment will be phased in over a period of time. It is also undetermined whether there will be full return *on* the included PVNGS investment or whether all or a portion of return *on* the investment will be disallowed for some period of time in the rate case.

It has been determined in this case that 147 MW of SJ–4 will be included in rate base on the effective date for new rates [in the rate case]. A full return *on* the 147 MW share of investment will begin at that time.

*Id.* at 179.

The Commission's statements that the record before it was insufficient to allow it to determine rate treatment for the included capacity, and its express reservation of the timing of phasing in of the investment and the determination of whether all of the investment will be phased in are significant to our disposition of these issues.

A. *Is the Determination that Total Exclusion Would be Unfair to Shareholders Arbitrary and Capricious and Unsupported by Substantial Evidence?*

 1. The Corporate Financial Model (CFM).

■ The attorney general argues that the Commission improperly relied on the CFM submitted by PNM to conclude that corporate earnings would be too low under total exclusion, raising several claims regarding the validity of the model, its underlying assumptions, and its fitness for the purpose for which it was used.

The merits of this issue are not yet ripe for our review. The question of corporate earnings will be considered again, and in greater depth, in the rate case, where PNM's financial health will be considered as a factor in determining reasonable rates. *See Final Order*, 101 Pub.Util.Rep. (PUR) 4th at 159–60. Thus, the issues of the return to investors and earnings under different capacities will recur, giving the attorney general and others the opportunity to contest the model's efficacy, offer alternatives, and present new evidence on the issue. Although the question can be presented solely in legal terms, *i.e.*, was the Commission's reliance arbitrary, capricious, and unsupported by substantial evidence, fact finding has not been completed on the issue, additional evidence may change the tenor of the arguments or moot them entirely, and the Commission has not yet exercised the full breadth of its discre-

tion. Critical to this question is that, although the Commission has determined not to exclude the capacity, it has not yet determined either its prudence or the timing of its inclusion (the phase-in issue). *See id.*

The attorney general contends that: "While it is true that the Commission did not use the CFM's to set rates, they were using them to conclude, in effect, that rates set under this particular alternative would produce earnings which were too low." This, however, is precisely why this issue is not fit for review—it will come into much greater focus after the Commission has decided what the rates will be and how capacity will be phased in.

Under the *Abbott* test, a court also must determine the potential hardship to the parties caused by postponing review. For this issue, as for the others to be examined, no harm results from delayed review. The final order has no immediate effect on consumers—no rates will go into effect until after the conclusion of the final hearing of this trilogy. *See, e.g., Toilet Goods Ass'n v. Gardner,* 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967) (case not ripe despite final agency action, when regulations, prior to enforcement, did not force a change in petitioner's position); *Midwestern Gas Transmission Co.,* 589 F.2d at 622–25 (D.C.Cir.1978) (administrative action not cause of hardship when effect will not be felt until conclusion of entire agency proceedings; preliminary order did not cause parties to alter position).

### 2. The Standard of Fairness was Applied in an Arbitrary and Capricious Manner.

■ The attorney general and NMIEC argue that the Commission based its decision in part on fairness to shareholders without defining fairness. By relying on an undefined standard, the Commission is alleged to have acted arbitrarily and capriciously when it applied the standard to the facts that it found. Much of the final order is devoted to explanation of why shareholder interest is not paramount and to analysis of risk allocation whereby the risk of investment in excess capacity is assumed by investors, as well as to why the Commission is not required to provide rates that compensate for loss caused by PNM's own actions. Nonetheless, the Commission concluded that the return to investors would be too low and unfair under total exclusion, and this decision is asserted to have been in error.

Our analysis indicates that this issue, too, is not yet ripe for review. The ultimate question of fairness to shareholders cannot be resolved until rates are set.[4] After the Commission has finally determined rates, having again entertained evidence on the issue, if the parties still believe that the Commission has not properly defined its standards, the issue will be reviewable to determine whether the conclusions were arbitrary and capricious. Until that time, although a legal issue has been presented, we have no basis to determine if the Commission's decision was arbitrary or capricious, because no final decision has been made. The Commission merely determined that, as a threshold matter, total exclusion would be unfair. It has not determined, however, what rates will be fair, and we do not feel it appropriate at this point interfere with its exercise of discretion.[5]

In *Duquesne Light Co. v. Barasch,* 488 U.S. 299, 109 S.Ct. 609, 619, 102 L.Ed.2d

---

**4.** The error in this argument is demonstrated by the characterization of the issue. NMIEC claims that "this case confronts the issue of whether, and to what extent, ratepayers may be made to pay for costs incurred beyond that necessary to provide service." In reality, no decisions have been made regarding what costs ratepayers will bear.

Our consideration of this issue is guided by the Commission's statement that it addressed the legal issues only within the parameters of the excess capacity hearing, not prudence or rate. 101 PUR 4th at 144. From that limited

perspective, it appears that the Commission's discussion of the balancing of ratepayer, investor and company interests, and the various possible tests used to facilitate such an analysis, was not intended to be dispositive of rates. It was used to determine the threshold question of exclusion, bearing in mind that exclusion of certain capacity could not be determined without consideration of the factors that would arise in the rate hearing and a determination of the public interest.

**5.** We are aware that "fairness" is an imprecise term and that the Commission must decide is-

646 (1989), the Court, with respect to an alleged confiscatory rate methodology, stated:

> [A]n otherwise reasonable rate is not subject to constitutional attack by questioning the theoretical consistency of the method that produced it. "It is not theory, but the impact of the rate order which counts." The economic judgments required in rate proceedings are often hopelessly complex and do not admit of a single correct result. The Constitution is not designed to arbitrate these economic niceties. Errors to the detriment of one party may well be canceled out by countervailing errors or allowances in another part of the rate proceeding. The Constitution protects the utility from the net effect of the rate order on its property. Inconsistencies in one aspect of the methodology have no constitutional effect on the utility's property if they are compensated by countervailing factors in some other aspect.

(quoting *Federal Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 602, 64 S.Ct. 281, 288, 88 L.Ed. 333 (1944)); *see also State v. Mountain States Tel. & Tel. Co.*, 54 N.M. 315, 337, 224 P.2d 155, 170 (1950) (adopting "end results" test as articulated in *Hope*).

This analysis is relevant to whether the fairness issue is properly before us at this time. Although we do not face the question of whether a rate is confiscatory—the issue is whether the Commission was overly generous to investors without adequately explaining its reasoning—we cannot evaluate a rate until it is set. The Commission, in further exercise of its discretion may balance out or alter, in the face of new evidence, the perceived error in its methodology, and we leave to it that opportunity to exercise its good judgment.

3. The Commission Arbitrarily and Capriciously Failed to Distinguish Between Prudent and Imprudent Investment.

The attorney general has combined several claims under this general assertion.

He argues that the Commission determined fairness and acceptability of an excess capacity plan without considering the prudence of investment decisions that created the excess. The attorney general contends that "'fairness' is necessarily dependent upon the prudence of the plant in question" and the decision was therefore arbitrary and capricious. He also alleges a violation of due process in that he was unable to present evidence on this point.

 We resolve this issue through a combination of our deference to the Commission's discretion and the ripeness doctrine. The Commission decided to trifurcate the proceedings based on the magnitude of the evidence and the size of the record generated by the proceeding. *See Final Order*, 101 Pub.Util.Rep. (PUR) 4th at 131. The Commission acted reasonably in breaking this case into manageable parts, and we will not review further the decision to sever in light of its legislative mandate to determine reasonable rates within statutory time constraints. *See* NMSA 1978, §§ 62–8–1, –7(C) (Repl.Pamp. 1984); *Otero County Elec. Coop., Inc. v. New Mexico Pub. Serv. Comm'n*, 108 N.M. 462, 465, 774 P.2d 1050, 1053 (1989); *see also* NMSA 1978, Section 62–10–6 (Repl. Pamp.1984) (Commission has discretion to order separate hearings on separate matters).

 Moreover, the ongoing nature of these proceedings makes our review at this juncture inappropriate. The Commission expressly stated in the final order that the prudence hearing will continue and that the impact of this case on the prudence analysis cannot be determined until that case is heard. 101 Pub.Util.Rep. (PUR) 4th at 180–81. We do not perceive any due process violations when, as here, the attorney general will be able to present evidence on the question of prudence at the prudence hearing. We find the attorney general's other claims speculative—the Commission has not yet determined if and to

sues based on evidence in the record and not on its ephemeral conceptions of fairness or equity. However, the posture of this case makes it im-

proper for us to delve into this matter at this time, and we reserve judgment until the record has been developed further.

what extent investment in any plant is imprudent, or how imprudence would effect its rate treatment. It certainly has not, by its actions in this case, determined that ratepayers must pay for imprudent investment. Consequently, we find that the factual record is not adequately developed on this question to allow review, and we leave it to the Commission to determine in the first instance its treatment of this matter.

■ The attorney general also argues that the Commission improperly changed its methodology by bringing plant into rates in a manner other than based on the most recent in-service date. We find it impossible to evaluate this alleged change in methodology, because the phase-in of specific capacity into rates has not yet been determined. It is true that the Commission excluded 130 MW of SJ-4, which the attorney general argues was more recent than PVNGS and should therefore not be excluded before PVNGS. It is not clear that the Commission is bound to a "first-in" methodology. Even if it were, however, we cannot discern any arbitrary or capricious action at this time, because the Commission has not yet determined how, or even if, PVNGS Units 1 and 2 will be phased into rate base.

### B. Is the Commission's Justification for Rejecting Total Exclusion Supported by Substantial Evidence?

1. Total Exclusion Would Provide Adequate Capacity to Provide Service.

The attorney general asserts that the Commission: determined without ample evidence in the record that total exclusion would not provide sufficient generating capacity over a reasonable planning period to maintain an acceptable reserve margin of twenty percent; changed its definition of the reasonable planning period of ten years by adding an extra year to the period; ignored evidence of the availability of alternative sources to be purchased, and relied on a PNM forecast that it has previously characterized as unreliable.

■ These issues ask us to apply substantial evidence review when the Commission has not yet finished taking evidence on these questions. What these contentions ignore is that the Commission has not yet determined how capacity will be phased into rates. The timing of inclusion has not yet been finally determined. Thus, the argument that the Commission changed its definition of the relevant time period to determine sufficient capacity fails as premature—it is not yet apparent to what purpose this alleged extension was used. Because this hearing was in essence a threshold determination, binding over certain capacity for further examination to determine if it was necessary to protect New Mexico's energy future, the Commission acted only to protect its options by considering future possibilities. At this time, however, it has not taken any final action that implicates the alleged "extra year," and we cannot determine whether it acted improperly. This conclusion is bolstered by the lack of evidence showing that the Commission *relied* in any way on evidence regarding the extra year.

The same concerns, namely the lack of final Commission action regarding phasing in of capacity and the narrow scope of the final order as a threshold determination pending the outcome of the prudence and rate hearings, dispose of the other two arguments. The attorney general claims that reliance on PNM's August 1988 load forecast was misplaced in light of the Commission's skepticism regarding the forecast's reliability. *See Final Order*, 101 Pub.Util.Rep. (PUR) 4th at 165. First, it is not clear that the Commission abused its discretion in considering a forecast that was submitted on the record and subject to examination by the parties. *See, e.g., Attorney General v. New Mexico Pub. Serv. Comm'n*, 101 N.M. 549, 553, 685 P.2d 957, 961 (1984) (Commission has discretion in considering conflicting evidence). More importantly, no final action in reliance on the forecast has been made, and any decision we would make on this issue at this point would be premature and would subject us to potentially duplicative or unnecessary decision making. Similarly, any argument that more contract purchases, rather than use of PNM's own available resources,

should be used can be presented at the subsequent hearings.

## 2. Decertification.

■ The Commission stated, as a *further* reason militating against total exclusion, that *if* it had determined that total exclusion of PVNGS was appropriate, in fairness to PNM it *would have had* to decertify the units, thus forever losing jurisdiction. The attorney general contends that the determination is wrong—that the Commission would not be *required* to decertify the PVNGS units.

The attorney general has not shown, however, how it would be beyond the Commission's discretion to decide that decertification would be appropriate in these circumstances. Moreover, the Commission has not made any decision in this regard. It only stated, as one factor, that decertification would have been fair. It has not determined that decertification should be done, in which case we would be able to evaluate the reasonableness of its decision, and it has not decided that total exclusion was inappropriate *because* of decertification. Accordingly, we find no reviewable decision before us.

## C. *Is the Mix of Generating Plant Included in Base Rate Arbitrary and Capricious and not Supported by Substantial Evidence?*

NMIEC contends that the Commission acted arbitrarily and capriciously and without support of substantial evidence when it adopted the mix of generating plant to be included in rates, arguing that no party advocated the specific mix chosen by the Commission and that no evidence was presented with regard to the impact of the mix chosen on ratepayers, investors or earnings. Rather than relying on methodologies and proposals for exclusion advocated by various witnesses, NMIEC maintains that the Commission unilaterally formulated its own proposal, combining aspects of the various proposals presented,

without a methodology supporting the mix chosen and without regard to the diverse theoretical underpinnings of the testimony upon which it relied. Having rejected all of the proposals offered, NMIEC contends that the Commission was compelled to reopen the record rather than to unilaterally formulate its own position.

We resolve this issue based on the scope of the Commission's authority and discretion, as well as in part on ripeness grounds. In a hearing on rates, if "the commission finds any such proposed rate or rates to be unjust, unreasonable or in any wise in violation of law, the commission shall determine the just and reasonable rate or rates to be charged or applied by the utility for the service in question and shall fix the same by order to be served upon the utility." NMSA 1978, Section 62–8–7(D) (Repl. Pamp.1984).[6]

The Commission is vested with broad discretion to pursue its statutory mandate to set "just and reasonable rate or rates," and it must exercise that discretion when proposed rates are found to be unjust or unreasonable. NMSA 1978, Section 62–8–7(D) (Repl.Pamp.1984); *see Attorney General v. New Mexico Pub. Serv. Comm'n*, 101 N.M. 549, 553–54, 685 P.2d 957, 961–62 (1984). As we stated in *Mountain States Telephone and Telegraph Co. v. New Mexico State Corp. Commission*, 90 N.M. 325, 331, 563 P.2d 588, 594 (1977):

> The Commission has a duty to be a prime mover in the procedure to see that the public interest is protected by establishing reasonable rates and that the utility is fairly treated so as to avoid confiscation of its property. Considering this broad mandate it could hardly be envisioned that the Commissioners would sit as spectators, like Roman Emperors in the coliseum, and simply exhibit a "thumbs-up or thumbs-down" judgment after the dust of battle settles in the arena.[7]

■ Although the Commission cannot arbitrarily reject the testimony of any par-

---

6. Admittedly, the hearing at issue was not directed specifically at establishing rates. Nonetheless, it was part of the ratemaking process.

7. *Mountain States* was concerned with the Corporation Commission, but we find its discussion relevant to the powers of the Public Service

**636**

ticular witness, neither is it required to accept testimony. It must weigh the conflicting evidence of witnesses, using its discretion to ultimately reach a decision within its mandate. *See Alto Village Servs. Corp. v. New Mexico Pub. Serv. Comm'n,* 92 N.M. 323, 587 P.2d 1334 (1978). When it weighs the evidence, accepting certain testimony while rejecting other, the Commission's decision nevertheless may be supported by substantial evidence. "[E]vidence of two conflicting opinions in the record does not mean that the decision arrived at is unsupported by substantial evidence." *Attorney General v. New Mexico Pub. Serv. Comm'n,* 101 N.M. at 553, 685 P.2d at 961.

We are mindful that under this analysis, the parameters set by the various plans that the parties supported by evidence may not be effective when the methodologies upon which those plans are set are altered. Thus, choosing various portions of disparate plans may make the assumptions regarding costs and returns inherent in any one or another methodology inappropriate. However, to reiterate our ripeness analysis, this was not a rate hearing. We are not in the position where we can evaluate the decisions made in the hearing as they affect rates, because the Commission has not yet determined rates. This question remains open before the Commission, and we will not act upon it until the Commission has made a final determination and considered all of the evidence.

Accordingly, we affirm the Commission's final order. As our discussion has indicated, should the issues that we deem not yet ripe for our consideration recur, we will entertain their appeal when the factual record is fully developed and after the Commission has exercised its discretion in considering them.

IT IS SO ORDERED.

SOSA, C.J., and RANSOM, J., concur.

Commission, which is vested with equally broad

ratemaking discretion.