909 P.2d 716

121 N.M. 156

**In the Matter of the RATES AND CHARGES OF U S WEST COMMUNICATIONS, INC.**

**ATTORNEY GENERAL OF the STATE OF NEW MEXICO, Appellant,**

v.

**NEW MEXICO STATE CORPORATION COMMISSION, Appellee,**

and

**U S West Communications, Inc., a Colorado corporation, Intervenor.**

**No. 21232.**

Supreme Court of New Mexico.

Dec. 11, 1995.

Tom Udall, Attorney General, Carol A. Clifford, Susan G. White, Assistant Attorneys General, Santa Fe, for Appellant.

Tom Udall, Attorney General, Carol A. Baca, Assistant Attorney General, Santa Fe, for Appellee.

Barry L. Hjort, Albuquerque, for Intervenor.

## OPINION

FROST, Justice.

1. Appellant Attorney General of the State of New Mexico (AG) brought this removal action before this Court pursuant to Article XI, Section 7 of the New Mexico Constitution. In this action we review portions of two orders issued by Appellee New Mexico State Corporation Commission (Commission), concerning a rate application filed by Intervenor U S WEST Communications, Inc. (U S WEST). We affirm the orders of the Commission.

## I. FACTS

2. U S WEST is the local telephone service provider for a multistate region that includes New Mexico. U S WEST replaced Mountain States Telephone and Telegraph Company, after the divestiture of the Bell operating companies from AT & T on January 1, 1984. The Commission regulates U S WEST's operations in New Mexico. Because U S WEST is a regulated monopoly utility, it must obtain Commission approval for the rates it charges for its services. These services are numerous and diverse, and include basic local service, pay telephones, and intrastate long distance. However, U S WEST does not publish the White and Yellow Pages; U S WEST's unregulated affiliate, U S WEST Direct (USWD),[1] publishes these directories.

3. The Commission regulates telephone rates under a grant of authority in our State Constitution, which provides that, "in the matter of fixing rates of telephone and telegraph companies, due consideration shall be given to the earnings, investment and expenditure as a whole within the state." N.M. Const. art. XI, § 7. The Constitution also requires that, in considering rates, "[t]he [C]ommission shall include in that consideration the earnings, investment and expenditures derived from or related to the sale of directory advertising and other directory listing services." *Id.* An amendment added this latter language on November 2, 1982, shortly after this Court reached the same result judicially. *See Mountain States Tel. & Tel. Co. v. Corporation Comm'n (In re Rates & Charges of Mountain States Tel. & Tel. Co.)*, 99 N.M. 1, 4–5, 653 P.2d 501, 504–05 (1982) (per curiam) [hereinafter *Mountain States 1982* ], *overruling Corporation Comm'n v. Mountain States Tel. & Tel. Co. (In re Mountain States Tel. & Tel. Co.)*, 84 N.M. 298, 502 P.2d 401 (1972).

4. On August 28, 1992, U S WEST filed its application with the Commission asking for a review of its revenue requirement and rate of return and requesting an adjustment of various rates and charges. The Commission bifurcated the proceedings on the application into (1) a revenue requirement determination and (2) a rate-design phase, in which revenue is allocated among classes of services. Each phase consisted of public hearings at which many parties presented evidence, including U S WEST, the Commission's staff (Staff),[2] the AG, and various intervenors and interested citizens.

■ 5. In the first phase, the Commission determined the total revenue requirement, which is the amount of money that will (1) cover U S WEST's operating costs and (2) "provide an opportunity to earn a reasonable rate of return on the property devoted to the business." Charles F. Phillips, Jr.,

---

1. In this opinion, we do not address the propriety of the legal relationship between U S WEST and USWD.

2. For most purposes, the Commission's Staff participates in the rate-making proceedings as a

party. *See Attorney Gen. v. New Mexico Pub. Serv. Comm'n (In re Public Serv. Co.)*, 111 N.M. 636, 639, 808 P.2d 606, 609 (1991).

*The Regulation of Public Utilities* 168 (2d ed. 1988). U S WEST, as a monopoly, faces less business risk than businesses in competitive sectors. As business risk decreases, so does the expected rate of return to which a regulated business is entitled. Consequently, U S WEST's "reasonable rate of return" is less than a reasonable rate of return for an otherwise-similarly-situated unregulated business in a competitive environment.

6. As stated above, the New Mexico Constitution requires that the Commission consider "the earnings, investment and expenditures derived from or related to the sale of directory advertising and other directory listing services." N.M. Const. art. XI, § 7. Consequently, even though USWD is a separate, unregulated business entity, as U S WEST's affiliate, its "earnings, investment and expenditures" must be considered in determining U S WEST's revenue requirement. The Commission decided to impute a fixed amount of USWD's revenue to U S WEST. In other words, the Commission presumed that a portion of USWD's revenues benefit U S WEST because of their affiliate relationship. This imputation had the effect of lowering U S WEST's revenue requirement. Thus, the amount U S WEST received from USWD in the form of an imputation reduced the amount that the Commission estimated U S WEST to need to recover from ratepayers.

7. By order issued April 8, 1993, the Commission determined that a just and reasonable revenue requirement by U S WEST is $7,731,000, increased by $1,256,000 a year for each of the next four years. In addition, the Commission adopted a directory-advertising revenue imputation from USWD to U S WEST of $12,647,000. The AG challenged that portion of the order which fixed the imputation. The AG proposed a higher imputation, using different formulae for making the calculation, and argued that the Commission erred by not adopting its recommendation.

8. In the second phase of the proceedings, the rate-design phase, the Commission determined the sources of funds to satisfy the total revenue requirement. U S WEST submitted a proposed rate design that specified how much it could charge for each service, such as pay telephones. The Commission reviewed this proposal, approving some proposed rates and rejecting others. For example, the Commission rejected U S WEST's proposal to increase the rate for pay telephones from twenty-five cents to thirty-five cents. Based on its evaluations of U S WEST's proposed rates, the Commission set the allowable rates U S WEST could charge for individual services. As a result, U S WEST was left with a revenue shortfall. In other words, the specific rates approved by the Commission were insufficient to cover the total revenue requirement allowed by the Commission in the first phase of the proceedings. This remaining shortfall, which totalled $3,242,000, was the residual revenue requirement.

9. The Commission decided to make up for this shortfall by increasing the rates charged to certain customers for certain services. Specifically, on May 7, 1993, the Commission issued an order which, among other things, spread the residual revenue requirement equally across the dial tone line rate of all residential and business customers, except Low Income Telephone Assistance Program customers. The dial tone line rate is the charge that customers pay for their basic telephone service. The Commission's order had the effect of increasing for the first year each residential and business customer's basic service charge by approximately forty-nine cents. The AG challenged the Commission's decision to spread the residual revenue requirement as improper and unsupported by the evidence.

## II. STANDARD OF REVIEW

10. In removal actions from the Commission, this Court "shall have the power and it shall be its duty to decide such cases on their merits." N.M. Const. art. XI, § 7. "Our scrutiny, therefore, is more exacting than that normally accorded administrative decision-making." *Burlington N. R.R. v. Corporation Comm'n (In re Burlington N. R.R.)*, 107 N.M. 582, 583, 761 P.2d 855, 856 (1988); *see also id.* at 583 n. 2, 761 P.2d at 856 n. 2 (explaining traditional administrative review). Under the proper standard of review, this Court may weigh the evidence to

arrive at an independent determination whether the Commission's order is just and reasonable. *Atchison, T. & S.F. Ry. v. Corporation Comm'n (In re Atchison, T. & S.F. Ry.)*, 99 N.M. 205, 207, 656 P.2d 868, 870 (1982). In other words, the Court independently determines whether "it is more likely than not that the Commission's order is just and reasonable." *Burlington N. R.R.*, 107 N.M. at 584, 761 P.2d at 857. Both satisfactory and substantial evidence must support the Commission's order. *Mountain States 1982*, 99 N.M. at 6, 653 P.2d at 506. "The term 'satisfactory' implies a weighing procedure." *Id.* For judicial review of an administrative agency's decision, "[s]ubstantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Behles v. New Mexico Pub. Serv. Comm'n (In re Timberon Water Co.)*, 114 N.M. 154, 156, 836 P.2d 73, 75 (1992).

11. However, this Court is not a rate-making body. *Mountain States 1982*, 99 N.M. at 7, 653 P.2d at 507. Our prior decisions have established the principle that the Commission has a wide degree of discretion in its rate-making authority. In fact, "[i]t is difficult to conceive of a more clear and all-inclusive grant of power to a governmental agency." *Mountain States Tel. & Tel. Co. v. New Mexico State Corp. Comm'n*, 90 N.M. 325, 331, 563 P.2d 588, 594 (1977) [hereinafter *Mountain States 1977*]. Although we do not presume that the Commission's decision is correct and the Commission's findings do not bind us, "[w]e recognize the expertise of the Commission in public utility management." *Burlington N. R.R.*, 107 N.M. at 584, 761 P.2d at 857. Our review is not de novo. *Id.* In its brief, the Commission brings to our attention an earlier decision of this Court that suggests that our review is de novo. *Village & Citizens of Grenville v. State Corp. Comm'n*, 53 N.M. 259, 260, 206 P.2d 259, 260 (1949). That case is contrary to the weight of New Mexico authority, and, to the extent that it stands for the proposition that this Court's review is de novo, we hereby overrule it.

## III. DIRECTORY–ADVERTISING REVENUE IMPUTATION

*A.  Whether the Commission Correctly Calculated the Imputation*

12. The first issue is whether the Commission correctly calculated the amount of the imputation from USWD to U S WEST. The amount of the imputation before these proceedings commenced was $8,368,000. U S WEST initially proposed continuing at this rate, but, during the hearings, it adjusted its proposal to $12,647,000. Staff proposed an imputation of $14,784,000, and the AG proposed an imputation of $19,284,000. However, the parties were not merely arguing about dollar amounts. Each party presented expert testimony regarding the proper formula or formulae that the Commission should use to calculate the imputation. The Commission ultimately adopted the amount of $12,647,000, using the methodology in U S WEST's adjusted proposal. The AG argued that its method of computing the imputation was the only method that the Commission could properly select.

13. The New Mexico Constitution, Article XI, Section 7 requires that the Commission *consider* the earnings, investments, and expenditures derived from or related to the sale of directory advertising and other directory listing services. "Consideration" involves deliberation, pondering, and judgment, but does not prescribe any specified conclusion. *See United Bhd. of Carpenters & Joiners v. Industrial Comm'n (In re School Bd.)*, 363 S.W.2d 82, 90–91 (Mo.Ct. App.1962) (per curiam) (holding that statute requiring labor commission to *consider* wage rates established by collective bargaining agreement did not require commission to follow or adopt those wage rates). In this case, the record indicates that the Commission did consider these earnings, investments, and expenditures.

14. The Commission imputed $12,647,000 of directory-advertising revenue. Section 7 does not require the Commission to impute all or any certain amount of these earnings, investments, and expenditures. "The Commission [is] not bound to the use of any single formula or combination of formu-

lae in determining rates. . . . It is the result reached, not the method employed, which is controlling." *Mountain States 1977*, 90 N.M. at 338, 563 P.2d at 601; *see also State Corp. Comm'n v. Mountain States Tel. & Tel. Co.*, 58 N.M. 260, 267, 270 P.2d 685, 689–90 (1954) (concluding that the Constitution does not impose upon the Commission the use of any one formula in determining rates). The determination of the proper formula or formulae for calculating the directory-advertising imputation is a discretionary function of the Commission.

15. The AG urged us to adopt the "California approach," approved in several other states. Under the California approach, the Commission would treat U S WEST and USWD as a unitary enterprise for purposes of computing a reasonable rate of return. *See City of L.A. v. Public Util. Comm'n (Pacific Tel. & Tel. Co.)*, 7 Cal.3d 331, 102 Cal.Rptr. 313, 323, 497 P.2d 785, 795 (1972) (in bank). However, the California approach has not been universally accepted; rather, courts and commissions in other jurisdictions have used a wide variety of approaches in determining the contribution that directory advertising should make towards supporting local telephone service. *See, e.g., Alabama Pub. Serv. Comm'n v. South Cent. Bell Tel. Co.*, 130 Pub.Util.Rep.4th (PUR) 92, 94, 1992 WL 486391 (Ala.P.S.C.1992) (fixing an imputation of 52% of directory-advertising gross revenues).

16. Moreover, the New Mexico Commission is not required to select a particular methodology for directory imputation merely because another jurisdiction has chosen that methodology, particularly since there are many different and competing approaches. *See Mountain States 1977*, 90 N.M. at 338, 563 P.2d at 601. The Commission properly exercised its discretion in selecting the method for calculating the directory-advertising imputation. Furthermore, the imputation selected by the Commission amounted to an increase of more than fifty percent over the prior imputation. The prior imputation was already enough to equal over one month's basic local service for every residential customer in New Mexico. After reviewing the record we cannot say that the result reached

by the Commission was not just and reasonable.

**B. Whether the Commission Properly Considered Yellow Pages Competition**

17. A principal controversy between the parties is whether the Commission may consider market competition when fixing a directory-advertising imputation. The AG argued that it is improper for the Commission to consider competition; U S WEST and the Commission argued that it is proper and appropriate. Competition increases business risk, and, as noted above, risk and rate of return are directly related. So, as competition increases, business becomes riskier; expected rate of return also increases to compensate investors for the higher level of risk.

18. U S WEST generally faces diminished competition in most of its areas of business; on the other hand, USWD's broad area of business, advertising, is competitive. If the Commission properly considered competition with regard to USWD and correctly concluded that competition existed, it could reasonably conclude that USWD should not transfer all of its profits to U S WEST. Therefore, the Commission could impute less than 100% of USWD's profits to U S WEST, and USWD could keep a portion of its profits.

19. In *Mountain States 1977*, 90 N.M. at 339, 563 P.2d at 602, we noted that, during the rate-design phase, the Commission may consider, in addition to cost-of-service evidence, various other types of evidence, including the existence of competition. *Cf.* New Mexico Telecommunications Act § 2, NMSA 1978, § 63–9A–2 (Repl.Pamp.1989) ("[I]t is further the policy of this state to encourage competition in the telecommunications industry. . . ."); *Mountain States Tel. & Tel. Co. v. New Mexico State Corp. Comm'n (In re Mountain States Tel. & Tel. Co.)*, 109 N.M. 504, 507, 787 P.2d 423, 426 (1990) (holding that Commission "could consider any relevant factor" in determining whether effective competition existed to warrant detariffing of pay telephone services under New Mexico Telecommunications Act). We likewise conclude that market competition is a proper factor for the Commission's

consideration during the revenue requirement phase.

20. Courts in other jurisdictions have also approved the consideration of competition. In *Turpen v. Oklahoma Corp. Commission,* 769 P.2d 1309, 1326–27 (Okla.1988), the Supreme Court of Oklahoma upheld a challenge to the Oklahoma Corporation Commission's calculation of imputed revenues and expenses from the Yellow Pages affiliate of Southwestern Bell Telephone Company. The court determined that the commission properly considered evidence of competition in the area of Yellow Pages advertising. *Id.* Likewise, in *MCI Telecommunications Corp. v. Public Service Commission,* 108 A.D.2d 289, 488 N.Y.S.2d 840, 845, *appeal withdrawn,* 66 N.Y.2d 760, 497 N.Y.S.2d 1033, 488 N.E.2d 134 (1985), the New York Supreme Court, Appellate Division held, similarly to *Mountain States 1977,* that the public service commission could "validly set differential utility rates on considerations other than relative costs," such as "competitive effects."

21. Finally, ignoring competition is contrary to logic in light of the divestiture of the Bell operating companies from AT & T. The divestiture resulted from an antitrust lawsuit against AT & T and was intended to promote competition in the formerly monopolistic telecommunications industry. *See United States v. AT & T,* 552 F.Supp. 131 (D.D.C.1982), *aff'd sub nom. Maryland v. United States,* 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983). The divestiture order permitted the local operating companies and their affiliates to continue publishing the Yellow Pages, because restricting them from this activity would have been anticompetitive. *Id.* at 193–94. Although segments of the telecommunications industry remain regulated and monopolistic, other segments are becoming highly competitive. Considering the rapidly evolving nature of this industry, it would be inappropriate to foreclose the Commission from considering such relevant factors as the existence and extent of competition in various market segments.

C. *Whether the Commission's Findings Were Supported by Satisfactory and Substantial Evidence*

22. Having concluded that competition is a proper factor for the Commission to consider, we next determine whether the Commission made adequate findings regarding competition, and whether there was satisfactory and substantial evidence supporting these findings. *See Mountain States 1982,* 99 N.M. at 6, 653 P.2d at 506. We conclude there was satisfactory and substantial evidence to support the Commission's decision concerning the issue of directory-advertising revenue imputation and, specifically, concerning the issue of competition.

23. When deciding whether the Commission's decision was supported by substantial evidence, this Court said:

Although the Commission cannot arbitrarily reject the testimony of any particular witness, neither is it required to accept testimony. It must weigh the conflicting evidence of witnesses, using its discretion to ultimately reach a decision within its mandate. When it weighs the evidence, accepting certain testimony while rejecting other, the Commission's decision nevertheless may be supported by substantial evidence. "[E]vidence of two conflicting opinions in the record does not mean that the decision arrived at is unsupported by substantial evidence."

*New Mexico Indus. Energy Consumers v. New Mexico Pub. Serv. Comm'n (In re Public Serv. Co.),* 111 N.M. 622, 635–36, 808 P.2d 592, 605–06 (1991) (citation omitted) (quoting *Attorney Gen. v. New Mexico Pub. Serv. Comm'n,* 101 N.M. 549, 553, 685 P.2d 957, 961 (1984)).

24. In this case, U S WEST, through the testimony of its expert witness, Ann M. Koehler–Christensen, introduced evidence that USWD faces competition in New Mexico. Koehler–Christensen testified that Yellow Pages advertisers, such as USWD, compete with each other and with other advertising businesses, such as newspapers, television, and direct mail. Koehler–Christensen's testimony included a list of Yellow Pages competitors throughout New Mexico. The AG's expert witness, Michaël D. Dirmeier, did not testify regarding competition.

25. The Staff's expert witness, James P. Marquart, advised the Commission that, in

light of increasing competition in telecommunications, USWD could in the future be at a competitive disadvantage in relation to competitors that do not have to make contributions to U S WEST's revenue requirement. Likewise, Koehler–Christensen urged the Commission to consider competition when fixing the imputation, because ignoring competition and imputing all of USWD's profits would act as a disincentive for USWD to increase its investment and expand its business in New Mexico.

26. The Commission weighed the conflicting evidence and rejected the AG's recommendation of a directory-revenue imputation of $19,284,000 on the basis that adoption of that recommendation might deprive USWD of any incentive to be profitable. USWD, as a rational investor trying to get maximum returns on its investments, could shift investment away from New Mexico if the Commission suppressed its ability to earn a profit. In addition, USWD would have no reason to improve its efficiency and competitive position if it could not benefit from its efforts by keeping the resulting profits. The Commission's findings were adequate and were supported by satisfactory and substantial evidence. Under the rule in *New Mexico Industrial Energy Consumers*, 111 N.M. at 635–36, 808 P.2d at 605–06, the Commission properly exercised its discretion in rejecting the AG's recommendation and in accepting U S WEST's and the Staff's evidence on this issue.

## IV. ALLOCATION OF RESIDUAL REVENUE REQUIREMENT

27. We next consider the AG's objections to the Commission's decisions regarding the second phase of the proceedings, the rate-design phase. The Commission ruled first on U S WEST's proposed tariffs for individual services, approving some and rejecting others. Tariffs are documents filed by the regulated utility with the Commission, detailing the rates to be charged for services. Once approved by the Commission, the tariffs become law. *See First Cent. Serv. Corp. v. Mountain Bell Tel.*, 95 N.M. 509, 511, 623 P.2d 1023, 1025 (Ct.App.1981). After ruling on the proposed tariffs, the Commission had

approved specific rates totalling only $4,489,-000 of the $7,731,000 total revenue requirement allowed by the Commission. Thus, U S WEST had a revenue shortfall, or residual revenue requirement, of $3,242,000.

28. The Commission, in its rate-design order of May 7, 1993, decided to spread the residual revenue requirement equally across the dial tone line rate of all residential and business customers, except Low Income Telephone Assistance Program customers. The resulting increase was approximately forty-nine cents or less per customer for the first year. The AG challenged, as improper and unsupported by the evidence, that portion of the order that spread the residual revenue requirement. In essence, the AG argued that the Commission improperly allocated common costs for local services, because, it claimed, U S WEST's cost studies were inadequate.

29. Common costs are costs that belong to two or more services or to the business as a whole. Common costs are not directly traceable to individual services. Phillips, *supra*, at 233 n. 27. Regulated monopolies use the total cost of a service as an important factor in determining its price. However, the total cost of a service is difficult to compute when components of the total cost cannot be traced to the service being priced. Consequently, allocating common costs among services is a significant problem. This problem is exacerbated for capital-intensive businesses like utilities, because common costs often represent a large percentage of total costs. *Id.* at 171.

30. U S WEST incurs the common costs at issue here in connection with the "local loop," which consists of telephone lines between customers and U S WEST's local central office, and the local switching equipment. The parties agree that these are common costs, because they are not directly traceable to particular users or services. This raises the question of who should bear these costs. The AG argued that the cost of the local loop should be attributed to the loop's users, which include virtually everyone who uses the telephone system, because all users benefit from the existence of the loop. U S WEST argued that local residential and business customers should bear these costs be-

cause they are the parties who require U S WEST to add new lines as these customers link in to the loop. Neither approach is patently unreasonable or universally accepted.

31. In fact, in attempting to deal with the thorny issue of common costs, regulators have used a variety of allocation methods.[3] *Id.* at 172. In this case, the AG argued that only fully-distributed cost studies are appropriate and that the Commission should have ordered these additional cost studies. These studies are designed to determine how much a particular service costs to provide, including the service's share of common costs. The provider then charges the customer accordingly. The AG criticized U S WEST's cost studies for not allocating common costs among multiple users of the telephone system.

32. However, the AG missed the point. In *Mountain States 1977*, 90 N.M. at 339, 563 P.2d at 602, we held that the Commission is not limited to considering only cost-of-service evidence during the rate-design phase. As a practical matter, it would be neither feasible nor desirable to price all services based solely on their cost. *Id.* at 338, 563 P.2d at 601. For example, basic telephone service for rural communities is often priced below cost to further the goal of universal service.

33. Although the Commission should consider cost during rate design, it is not required to rely on any one rate-design method. *See id.* at 338–39, 563 P.2d at 601–02. The Commission may additionally consider factors other than cost, examples of which are the universal service objective, the value of the service to the user, and the existence and extent of competition. Although the Commission noted that fully-distributed cost studies would have been helpful, it did not hold or find that these studies were necessary. The Commission could make rate-design decisions without requiring fully-distributed common cost studies to supplement U S WEST's cost studies. *See id.*

34. In its answer brief, the Commission argued that the AG impermissibly raised before this Court new arguments that the AG did not raise before the Commission. The Commission pointed out that the AG did not request below that the Commission order U S WEST to perform new cost studies and that the Commission enter an interim rate design pending these new cost studies. Consequently, the Commission urged us not to consider the AG's request for relief on this issue. The Commission and U S WEST also contended that the interim rate design requested by the AG would result in pricing anomalies. However, because we decide that the cost studies upon which the Commission based its decision were adequate, we need not address these arguments.

35. Lastly, we review the Commission's residual revenue allocation to determine if it is reasonable and sufficiently supported. *See id.* at 338, 563 P.2d at 601. "There is a zone of reasonableness between confiscation and extortion in which the commission's jurisdiction to make rates should be confined." *State v. Mountain States Tel. & Tel. Co.*, 54 N.M. 315, 338, 224 P.2d 155, 170–71 (1950). We cannot say that an increase of forty-nine cents per customer is extortionate. The AG challenged the sufficiency of the evidence supporting the Commission's order. We concluded, however, that the Commission could rely on U S WEST's cost studies without ordering additional fully-distributed cost studies; the cost information before the Commission therefore was sufficient to support the Commission's order. Overall, this Court cannot say that there is not satisfactory and substantial evidence to support the Commission's rate-design order. We also cannot say that the order more likely than not is unjust or unreasonable.

### V. CONCLUSION

36. For the foregoing reasons we affirm the Commission's orders of April 8, 1993, and May 7, 1993.

37. **IT IS SO ORDERED.**

BACA, C.J., and FRANCHINI, J., concur.

---

3. These methods include average total or embedded cost and marginal cost pricing. We do not

attempt to define these methods here, since they are not at issue on appeal.