The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number:

Filing Date: May 13, 2024

**No. S-1-SC-39406**

**COALITION FOR CLEAN AFFORDABLE ENERGY and RENEWABLE ENERGY INDUSTRIES ASSOCIATION OF NEW MEXICO,**

Appellants,

v.

**NEW MEXICO PUBLIC REGULATION COMMISSION,**

Appellee,

and

**ALBUQUERQUE BERNALILLO COUNTY WATER UTILITY AUTHORITY, BERNALILLO COUNTY, NEW ENERGY ECONOMY, and NEW MEXICO AFFORDABLE RELIABLE ENERGY ALLIANCE, and NEW MEXICO OFFICE OF THE ATTORNEY GENERAL,**

Intervenors-Appellees.

**In the Matter of the Public Service Company of New Mexico's Petition for a Declaratory Order Regarding Whether the Efficient Use of Energy**

**Act Permits a Utility to Implement a Full Revenue Decoupling Mechanism; In the Matter of the Petition of Albuquerque Bernalillo County Water Utility Authority and Bernalillo County for Declaratory Order Regarding Whether the Efficient Use of Energy Act Mandates the Commission to Fully Authorize Full Decoupling Upon Petition by a Public Utility, Case No. 20-00212-UT**

**CONSOLIDATED WITH NO. S-1-SC-39401**

**PUBLIC SERVICE COMPANY OF NEW MEXICO,**

Appellant,

v.

**NEW MEXICO PUBLIC REGULATION COMMISSION,**

Appellee,

and

**ALBUQUERQUE BERNALILLO COUNTY WATER UTILITY AUTHORITY, BERNALILLO COUNTY, NEW ENERGY ECONOMY, and NEW MEXICO AFFORDABLE RELIABLE ENERGY ALLIANCE, and NEW MEXICO OFFICE OF THE ATTORNEY GENERAL,**

Intervenors-Appellees.

**In the Matter of the Application of Public Service Company of New Mexico's Petition for a Declaratory Order Regarding Whether the Efficient Use of Energy Act Permits a Utility to Implement a Full Decoupling Mechanism; In the Matter of the Petition of Albuquerque Bernalillo County Water Utility Authority and Bernalillo County for a Declaratory Order Regarding Whether the Efficient Use of Energy Act Mandates the Commission to Fully Authorize Full Decoupling Upon Petition by the Public Utility, NMPRC Case No. 20-00212-UT**

**APPEAL FROM THE NEW MEXICO PUBLIC REGULATION COMMISSION**

Cara Lynch Legal Services
Cara R. Lynch
Albuquerque, NM

for Appellant Coalition for Clean Affordable Energy

Jason Marks Law, LLC
Jason A. Marks
Albuquerque, NM

for Appellant Renewable Energy Industries Association of New Mexico

PNM Resources, Inc.
Stacey J. Goodwin
Albuquerque, NM

Miller Stratvert, P.A.
Richard L. Alvidrez
Albuquerque, NM

Wilkinson Barker Knauer, LLP
Raymond L. Gifford
Debrea M. Terwilliger
Denver CO

for Appellant Public Service Company of New Mexico

Russell R. Fisk, Associate General Counsel
Santa Fe, NM

for Appellee New Mexico Public Regulation Commission

JAlbright Law, LLC.
Jeffrey H. Albright
Albuquerque, NM

for Intervenor Bernalillo County

Stelzner, Winter, Warburton, Flores & Dawes, P.A.
Keith W. Herrmann
Nann M. Winter
Albuquerque, NM

Albuquerque Bernalillo County Water Utility Authority
Charles W. Kolberg, General Counsel
Albuquerque, NM

for Intervenor Albuquerque Bernalillo County Water Utility Authority

The Gould Law Firm
Peter J. Gould
Kelly D. Gould
Santa Fe, NM

for Intervenor New Mexico Affordable Reliable Energy Alliance

New Energy Economy
Mariel Nanasi
Santa Fe, NM

for Intervenor New Energy Economy


Gideon Elliot, Assistant Attorney General
Keven Gedko, Assistant Attorney General
Santa Fe, NM

for Intervenor New Mexico Office of the Attorney General

**OPINION**

**VIGIL, Justice.**

{1}    Traditional utility revenues are based on how much energy a utility's customers use, but energy efficiency and load management programs result in a decrease of energy consumption and, therefore, reduce the revenues collected by the utility.[1] In order to encourage utilities to invest in energy efficiency and load management programs, the Efficient Use of Energy Act (EUEA), NMSA 1978, §§ 62-17-1 to -11 (2005, as amended through 2020), directs the Public Regulation Commission (the Commission), upon request by a utility, to provide for a rate adjustment mechanism to account for any such decrease in energy consumption. Section 62-17-5(F)(2). As we explain in detail below, this mechanism is commonly referred to as "revenue decoupling," which can be either partial or full. The dispute here is whether the EUEA provides for a partial or full decoupling mechanism.

---

[1]Under the EUEA, "'energy efficiency' means measures, including energy conservation measures, or programs that target consumer behavior, equipment or devices to result in a decrease in consumption of electricity and natural gas without reducing the amount or quality of energy services." NMSA 1978, § 62-17-4(F) (2019). "'[L]oad management' means measures or programs that target equipment or devices to result in decreased peak electricity demand or shift demand from peak to off-peak periods." Section 62-17-4(H).

{2}     In a direct appeal from declaratory proceedings before the Commission, Appellants the Public Service Company of New Mexico (PNM), Coalition for Clean Affordable Energy (CCAE), and Renewable Energy Industries Association of New Mexico (REIA) argue that Section 62-17-5(F)(2) plainly describes a full revenue decoupling mechanism. The Commission in turn asserts that Section 62-17-5(F)(2) is ambiguous and, when construed with other relevant statutory provisions, contemplates approval of a partial revenue decoupling mechanism. Several intervening parties in this appeal support the Commission's interpretation.

{3}     For the reasons explained herein, we determine that Section 62-17-5(F)(2) clearly describes a full revenue decoupling mechanism. Because the Commission's interpretation of Section 62-17-5(F)(2) is unlawful and unreasonable, we annul and vacate the Commission's order in its entirety. NMSA 1978, § 62-11-5 (1982) (providing that this Court has "no power to modify" an order from the Commission "but shall either affirm or annul and vacate the same").

{4}     We decline to reach additional issues raised about the Commission's construction of Section 62-17-5(F)(4) or NMSA 1978, § 62-13-13.2 (2010) because the Commission's reasoning on these issues is likely to change in view of our opinion. *See N.M. Indus. Energy Consumers v. N.M. Pub. Serv. Comm'n*, 1991-NMSC-018, ¶ 26, 111 N.M. 622, 808 P.2d 592 (listing factors for determining

whether agency action is ripe for adjudication, including "whether further agency decisions may moot some of the contentions"). We also do not entertain a facial constitutional challenge to Section 62-17-5(F)(4) discussed by Intervenor New Energy Economy in its answer brief, as the issue was not raised in a Notice of Appeal and therefore is not properly before the Court. Rule 12-601(B) NMRA; NMSA 1978, § 62-11-1 (1993).

## I.     BACKGROUND

{5}     As we are asked to resolve a dispute about the type of revenue decoupling required under Section 62-17-5(F)(2), we begin by situating the concept of revenue decoupling within the ratemaking process. We then summarize the underlying proceedings as relevant to this appeal.

## A.     Revenue Decoupling as Situated Within the Ratemaking Process

{6}     Briefly stated, revenue decoupling is a type of rate regulation that reforms the way that a public utility collects revenue. When regulating a utility's rates under the Public Utility Act (PUA), NMSA 1978, §§ 62-1-1 to 62-6-28 and 62-8-1 to 62-13-16 (1979, as amended through 2021), the Commission typically begins by evaluating a revenue requirement for the utility, which is an amount of future revenue to be collected by the utility that is determined to be just and reasonable. *See In re Petition of PNM Gas Servs. (PNM Gas)*, 2000-NMSC-012, ¶¶ 6-8, 129 N.M. 1, 1 P.3d 383;

3

§ 62-8-1 ("Every rate made, demanded or received by any public utility shall be just and reasonable."). The just and reasonable standard requires the Commission to set rates that are "neither unreasonably high so as to unjustly burden ratepayers with excessive rates nor unreasonably low so as to constitute a taking of property without just compensation or a violation of due process by preventing the utility from earning a reasonable rate of return on its investment." *Pub. Serv. Co. of N.M. v. N.M. Pub. Regul. Comm'n (PNM)*, 2019-NMSC-012, ¶ 10, 444 P.3d 460 (internal quotation marks and citation omitted). "Under the PUA, a rate is just and reasonable when it balances the investor's interest against the ratepayer's interest. Only when a rate falls within a zone of reasonableness between utility confiscation and ratepayer extortion can the rate be just and reasonable." *N.M. Att'y Gen. v. N.M. Pub. Regul. Comm'n*, 2011-NMSC-034, ¶ 13, 150 N.M. 174, 258 P.3d 453 (ellipsis, internal quotation marks, and citation omitted).

{7} After approving a revenue requirement for a utility, the Commission next designs rates that will provide "the utility a reasonable opportunity to recover its revenue requirement and that fairly distributes just and reasonable rates between different classes of ratepayers." *PNM Gas*, 2000-NMSC-012, ¶ 89. Historically, the Commission has not been "required to rely on any one rate-design method," *N.M. Att'y Gen. v. N.M. State Corp. Comm'n*, 1996-NMSC-002, ¶ 33, 121 N.M. 156, 909

4

P.2d 716, and has been granted considerable discretion in designing rates, *PNM Gas*, 2000-NMSC-012, ¶ 99. We have recognized several policy factors that are relevant to rate design, such as the cost of service, the value of service, conservation, competition, comparison with other rates in the geographic area, continuity, stability, and gradualism that avoids rate shock. *Id.* ¶¶ 100-02; *see also Mountain States Tel. & Tel. Co. v. N.M. State Corp. Comm'n*, 1977-NMSC-032, ¶ 73, 90 N.M. 325, 563 P.2d 588 (listing "various types of evidence that merit consideration" in designing rates in the context of a telephone utility application). This Court has specifically "discouraged the use of cost of service as a sole criterion in designing rates." *PNM Gas*, 2000-NMSC-012, ¶ 100.

{8}    Traditionally, the Commission has fixed rates with the expectation that the utility will collect the majority of its approved revenue through a predicted quantity of sales. This traditional regulatory approach creates disincentives for utilities to invest in energy efficiency and load management, as any decrease in energy consumption will contribute to a decrease in sales. Regulatory Assistance Project, *Revenue Regulation & Decoupling: A Guide to Theory & Application* 1-2 (2016)

(hereinafter RAP, *Revenue Regulation*).[2] Revenue decoupling seeks to eliminate or reduce these regulatory disincentives by breaking the traditional link between a utility's revenue collections and its sales. *Id.* 2.

{9}     With revenue decoupling, the Commission will still approve a revenue requirement for a utility and will design rates in a way that fairly allocates revenue collections between the ratepayer classes and permits the utility a reasonable opportunity to recover its revenue requirement. *PNM Gas*, 2000-NMSC-012, ¶ 89. In addition, the Commission will approve a mechanism that will automatically or semiautomatically adjust rates based on variations between approved revenue and actual sales. RAP, *Revenue Regulation* 3-4, 8-9. As contemplated by the EUEA, the decoupling mechanism will be "a separately identified tariff rider that shall not be used to collect commission-approved energy efficiency and load management program costs and incentives." Section 62-17-5(F)(2); *see also N.M. Att'y Gen. v. N.M. Pub. Regul. Comm'n*, 2015-NMSC-032, ¶ 32, 359 P.3d 133 ("Riders are surcharges applied to directly recover specific costs."). The mechanism will essentially act as a true-up rider, *see* RAP, *Revenue Regulation* 11, raising or

---

[2]Available at https://www.raponline.org/wp-content/uploads/2023/09/rap-revenue-regulation-decoupling-guide-second-printing-2016-november.pdf (last visited May 1, 2024).

lowering rates to ensure that the utility collects the amount of revenue that the Commission has approved for the utility to collect under the mechanism. The decoupling mechanism thereby renders the utility fully or partially neutral towards energy efficiency and load management, as the utility will recover the approved amount of revenue despite potential declines in sales. *Id.* at 2.

{10} The parties to this appeal all agree that Section 62-17-5(F)(2) describes a revenue decoupling mechanism. The parties disagree, however, as to what type of revenue decoupling mechanism is described. Revenue decoupling mechanisms are generally categorized into one of three different types: full revenue decoupling mechanisms, limited revenue decoupling mechanisms, and partial revenue decoupling mechanisms. RAP, *Revenue Regulation* 11-13. The different types generally reflect the amount or kinds of revenue that the utility may collect under the mechanism. Based on the posture of the parties in this appeal, we are concerned only with full or partial revenue decoupling mechanisms: Appellants argue that the plain language of Section 62-17-5(F)(2) mandates approval of a full revenue decoupling mechanism; the Commission defends its conclusion that Section 62-17-5(F)(2) permits approval of a partial revenue decoupling mechanism.

{11} With a full revenue decoupling mechanism, a utility will recover the total amount of approved revenue through the mechanism. *See* RAP, *Revenue Regulation*

11-12. Any deviations between actual sales and approved revenue will result in a full reconciliation. *Id.* 12. For example, if the utility experiences a $2 million shortfall because actual sales do not match approved revenue, the full decoupling mechanism will adjust rates so that the utility recovers the $2 million shortfall. As explained by the Regulatory Assistance Project,

> Full decoupling can be likened to the setting of a budget. Through currently used rate-case methods, a utility's revenue requirement—i.e., the total revenues it will need in a period (typically, a year) to provide safe, adequate, and reliable service—is determined. The utility then knows exactly how much money it will be allowed to collect, no more, no less. Its profitability will be determined by how well it operates within that budget. Actual sales level will not, however, have any impact on the budget.

*Id.* 11. Full revenue decoupling insulates a utility's revenue collections from losses or excesses in the quantity of sales, even if those losses or excesses are due to weather fluctuations, ordinary business risks, or factors other than energy efficiency and load management. *Id.* 35. "[N]o matter the amount of consumption, the utility and the consumers as a whole will receive and pay the allowed revenue." *Id.*

{12}    Partial revenue decoupling works similarly to full revenue decoupling, but the utility recovers only a portion or percentage of approved revenue through the decoupling mechanism. *Id.* 12. Thus, in partial revenue decoupling, "[a]ny variation in sales results in a partial true-up of utility revenues (e.g., 50%, or 90%, of the revenue shortfall is recovered)." *Id.* For example, if the utility experiences a

8

$2 million shortfall because actual sales do not match approved revenue, the mechanism will adjust rates so that the utility recovers a specified percentage of the shortfall, such as 50% or $1 million. Thus, unlike full revenue decoupling, partial revenue decoupling insulates only a portion of the utility's collections from revenue losses due to various business risks. *Id.*

**B.    The Underlying Proceedings**

{13}    The declaratory proceedings on appeal have their genesis in a petition filed by PNM in 2020 which requested the Commission's approval of Shared Cost of Service Rider No. 52 (Rider No. 52) applicable to its residential and small commercial classes. Rider No. 52 contained a full revenue decoupling mechanism which ensured that the revenue approved in PNM's 2015 general rate case would be recovered by PNM without regard to the quantity of electricity sold. Several parties intervened in the proceedings and objected to the proposed rider on various grounds, including on the grounds that the rider relied on stale data and was not related to removing regulatory disincentives to PNM's expenditures in energy efficiency and load management. In view of the dispute about the legal basis for the rider, PNM moved to vacate a public hearing on proposed Rider No. 52 and to stay proceedings on its petition so that it could file a declaratory proceeding on the meaning of Section 62-

17-5(F)(2) and other recent amendments to the EUEA. The Hearing Examiner entered an order vacating hearings and staying the proceedings on the petition.

{14} PNM and several other parties then requested a declaratory order from the Commission on the legal issues identified in the earlier proceedings. The Commission agreed that a declaratory order was appropriate and ordered briefing on the issues. In briefing and oral argument, PNM, CCAE, REIA, and one other party argued that the plain language of Section 62-17-5(F)(2) compelled the Commission to approve a full revenue decoupling mechanism. Several other parties argued that Section 62-17-5(F)(2) allowed the Commission to approve a limited revenue decoupling mechanism that would permit PNM to recover revenue lost due to energy efficiency and load management.

{15} The Hearing Examiner assigned to the declaratory proceedings issued a Recommended Decision suggesting that Section 62-17-5(F)(2) did not compel the Commission to approve a full revenue decoupling mechanism. The Hearing Examiner described revenue decoupling as "a ratemaking and regulatory tool intended to break the link between a utility's recovery of fixed costs and a consumer's energy consumption by reducing the impact of energy consumption on a utility's recovery of its fixed costs." The Hearing Examiner explained that full revenue decoupling "severs the connection between a utility's sales and revenues no

matter the reason for variation in the utility's sales[ and] has been likened to setting a budget for the utility."

{16}    Although the Hearing Examiner acknowledged that a literal reading of Section 62-17-5(F)(2) contemplated approval of a full decoupling mechanism, the Hearing Examiner rejected that reading because Section 62-17-5(F)(2) is "ostensibly ambiguous in two instances but genuinely ambiguous in only one fundamental way." As to the first asserted ambiguity, the Hearing Examiner concluded that the phrase "remove regulatory disincentives" as used in Section 62-17-5(F)(2) makes the statute "superficial[ly]" ambiguous. The Hearing Examiner suggested that PNM's interpretation of the phrase to mandate adoption of a full revenue decoupling mechanism would "shoehorn an all-encompassing definition of regulatory disincentives to fit their predestined conception of *mandatory* full revenue decoupling whenever a utility petitions for the removal of such disincentives." The Hearing Examiner recommended that the Commission construe "remove regulatory disincentives" as used in Section 62-17-5(F)(2) in harmony with identical language used in Section 62-17-5(F)(1) and Section 62-17-3 to require the Commission to "balance[] the public interest, consumers' interests, and investors' interests" in approving a decoupling mechanism.

11

{17}     As to the second perceived ambiguity, the Hearing Examiner concluded that interpreting Section 62-17-5(F)(2) to command the Commission to grant a utility's petition for full revenue decoupling "flatly contradicts" this balancing requirement and the just and reasonable standard of the PUA. The Hearing Examiner reasoned that reading "a single, isolated subsection of the EUEA that includes generic decoupling language" to strip the Commission of authority to set just and reasonable rates is absurd and contradictory. The Hearing Examiner also rejected the contention that full revenue decoupling was consistent with the setting of a just and reasonable rate, suggesting instead that full revenue decoupling is "unharmonizable and irreconcilable" with the just and reasonable standard. The Hearing Examiner asserted that this absurdity and contradiction support rejection of the plain language of Section 62-17-5(F)(2).

{18}     However, the Hearing Examiner acknowledged the necessity to "come to grips with the fact that Section 62-17-5(F)(2) unmistakably incorporates the concept of decoupling." The Hearing Examiner thus attempted to "harmonize the decoupling language in [Section 62-17-5(F)(2)] with the entirety of the EUEA and applicable rate-setting principles enshrined in the PUA." To this end, the Hearing Examiner turned to "a third alternative" to full or limited revenue decoupling that is "evident in the literature propounded [by the parties]: *partial* decoupling." The Hearing

Examiner explained, quoting RAP, *Revenue Regulation* 12, "'Partial decoupling insulates only a portion of the utility's revenue collections from deviations of actual from expected sales.'" The Hearing Examiner suggested that a partial revenue decoupling mechanism is consistent with Section 62-17-5(F)(2) and also "affords the Commission the discretion to perform the balancing of interests tests called for in the EUEA and integral to the Commission's rate-setting authority under the PUA."

{19} The Commission subsequently entered its declaratory order accepting, approving, and adopting the Recommended Decision. The Commission explained that a full revenue decoupling mechanism will "have effects that far exceed the stated purpose of [Section 62-17-5(F)(2)], which is to 'remove regulatory disincentives.'" The Commission likewise viewed full revenue decoupling as "a radical departure from the regulatory paradigm established in the PUA, eliminating ordinary business risks to which public utilities are subject." The Commission also rejected an interpretation of Section 62-17-4(F)(2) "that would eliminate the Commission's authority to balance the interests of ratepayers, investors and the public," explaining that the Legislature would have more clearly expressed an intent to eliminate this authority "in amendments to the EUEA [and] the PUA." The Commission therefore

concluded that a partial revenue decoupling mechanism "is consistent with the stated purpose of removing regulatory disincentives."

**{20}** PNM appeals from the Commission's declaratory order pursuant to Section 62-11-1 and Rule 12-601. CCAE and REIA also appeal, and we have consolidated the appeals.

## II.    STANDARD OF REVIEW

**{21}** On appeal of orders from the Commission, our review is limited to determining "whether the Commission's decision is arbitrary and capricious, not supported by substantial evidence, outside the scope of the agency's authority, or otherwise inconsistent with law." *PNM*, 2019-NMSC-012, ¶ 12 (brackets, internal quotation marks, and citation omitted). The party appealing an order from the Commission bears the burden "to show that the order appealed from is unreasonable, or unlawful." Section 62-11-4.

**{22}** Appellants raise pure questions of law in challenging the Commission's construction of Section 62-17-5(F)(2). We review questions of law de novo. *Pub. Serv. Co. of N.M. v. N.M. Pub. Util. Comm'n*, 1999-NMSC-040, ¶ 14, 128 N.M. 309, 992 P.2d 860. We have explained that, when reviewing an order from the Commission construing its governing statute, we "will begin by according some deference to the agency's interpretation." *Morningstar Water Users Ass'n v. N.M.*

14

*Pub. Util. Comm'n*, 1995-NMSC-062, ¶ 11, 120 N.M. 579, 904 P.2d 28. However, because "[s]tatutory construction is not a matter within the purview of the [Commission's] expertise," we will grant little deference to the Commission's interpretation of an unambiguous statute. *Albuquerque Bernalillo Cnty. Water Util. Auth. v. N.M. Pub. Regul. Comm'n*, 2010-NMSC-013, ¶ 50, 148 N.M. 21, 229 P.3d 494 (internal quotation marks and citation omitted). We are more likely to accord heightened deference to the Commission's interpretation "if the relevant statute is unclear or ambiguous, the legal questions presented implicate special agency expertise or the determination of fundamental policies within the scope of the agency's statutory function, and it appears that the agency has been delegated policy-making authority in the area." *Doña Ana Mut. Domestic Water Consumers Ass'n v. N.M. Pub. Regul. Comm'n*, 2006-NMSC-032, ¶ 10, 140 N.M. 6, 139 P.3d 166 (internal quotation marks and citations omitted); *accord New Energy Econ., Inc. v. N.M. Pub. Regul. Comm'n*, 2018-NMSC-024, ¶ 25, 416 P.3d 277. But our "deference does not give [the Commission] the authority to pour any meaning it desires into the statute." *State ex rel. Sandel v. N.M. Pub. Util. Comm'n*, 1999-NMSC-019, ¶ 17, 127 N.M. 272, 980 P.2d 55 (internal quotation marks and citation omitted). We will reverse the Commission "if the agency's interpretation of a law is unreasonable or unlawful." *Morningstar*, 1995-NMSC-062, ¶ 11.

15

## III.  DISCUSSION

{23}   We must construe Section 62-17-5(F)(2) to determine what type of revenue decoupling it prescribes. The parties' arguments also reveal a deeper disagreement about the extent of the Commission's power to review and potentially modify a decoupling mechanism sought under Section 62-17-5(F)(2). We therefore additionally address the scope of the Commission's authority under Section 62-17-5(F)(2) as necessary to our disposition of the issues.

{24}   When considering a question of statutory construction, we begin with the maxim, "The text of a statute or rule is the primary, essential source of its meaning." NMSA 1978, § 12-2A-19 (1997). Under "the plain meaning rule," a statute is "to be given effect as written without room for construction unless the language is doubtful, ambiguous, or an adherence to the literal use of the words would lead to injustice, absurdity or contradiction, in which case the statute is to be construed according to its obvious spirit or reason." *State v. Davis*, 2003-NMSC-022, ¶ 6, 134 N.M. 172, 74 P.3d 1064; *State ex rel. Helman v. Gallegos*, 1994-NMSC-023, ¶¶ 23-24, 117 N.M. 346, 871 P.2d 1352. If a term or phrase is not defined in a statute, we interpret the term according to its ordinary dictionary meaning absent a legislative intent to impose a contrary meaning. *N.M. Att'y Gen. v. N.M. Pub. Regul. Comm'n*, 2013-NMSC-042, ¶ 26, 309 P.3d 89. We are also cognizant that words do not have

16

intrinsic meanings, and "[a] word is merely a symbol which can be used to refer to different things." *Helman*, 1994-NMSC-023, ¶ 24 (internal quotation marks and citation omitted). We therefore construe words and phrases as used in the context of the whole statute and ensure that no part of the statutory language is rendered superfluous. *State v. Vest*, 2021-NMSC-020, ¶ 18, 488 P.3d 626.

{25}   As relevant to our analysis, Section 62-17-5(F)(1)-(2) provides that the Commission shall:

> (1) upon petition or its own motion, identify and remove regulatory disincentives or barriers for public utility expenditures on energy efficiency and load management measures in a manner that balances the public interest, consumers' interests and investors' interests;

> (2) upon petition by a public utility, remove regulatory disincentives through the adoption of a rate adjustment mechanism that ensures that the revenue per customer approved by the commission in a general rate case proceeding is recovered by the public utility without regard to the quantity of electricity or natural gas actually sold by the public utility subsequent to the date the rate took effect. Regulatory disincentives removed through a rate adjustment mechanism shall be separately calculated for the rate class or classes to which the mechanism applies and collected or refunded by the utility through a separately identified tariff rider that shall not be used to collect commission-approved energy efficiency and load management program costs and incentives.

Appellants argue that Section 62-17-5(F)(2) clearly describes a full revenue decoupling mechanism, as only full revenue decoupling will permit a utility to recover the approved amount of revenue "without regard to the quantity of electricity or natural gas actually sold by the public utility." In response, the Commission

asserts that "partial decoupling is consistent with the 'without regard' language in [Section 62-17-5(F)(2)] because partial decoupling, like full decoupling, ensures that a utility recovers the cost of providing electricity without connection to the quantity of energy sold, just not to the extent allowed by full decoupling."

{26} We conclude that Section 62-17-5(F)(2) clearly describes a full revenue decoupling mechanism. In full revenue decoupling, a utility recovers the total amount of approved revenue under the decoupling mechanism, with no attention paid to the quantity of actual sales. RAP, *Revenue Decoupling* 11-12. In partial revenue decoupling, a portion of the utility's approved revenue will still be recovered with reference to the quantity of sales. *Id.* 12. For example, if a utility experiences a revenue shortfall, only a percentage of that shortfall will be recovered by the utility under a partial revenue decoupling mechanism Thus, only a full revenue decoupling mechanism will ensure that the utility recovers approved revenue "without regard to the quantity of electricity or natural gas actually sold." Section 62-17-5(F)(2); *see also* regard, *Black's Law Dictionary* (11th ed. 2019) ("regard n. (14c) 1. Attention, care or consideration <without regard for the consequences>."). More to the point, we find nothing in the statutory language which would support the partial or percentage approach to decoupling that would be implemented by the Commission's interpretation of Section 62-17-5(F)(2). The

statute does not say that the Commission shall approve a rate adjustment mechanism which ensures that the utility recovers only a part or percentage of approved revenue without regard to the quantity of sales. We will not read language into a statute that is not there, especially if the statutory language makes sense as written. *Sandel*, 1999-NMSC-019, ¶ 17.

{27} The Commission nevertheless reasons that Section 62-17-5(F)(2) is ambiguous because of the phrase "remove regulatory disincentives." We agree that this phrase is not clearly defined, but we do not agree that the phrase injects ambiguity into the statute with respect to the type of decoupling mechanism required. Although "remove regulatory disincentives" is not defined in the EUEA, the phrase is used in the preceding Section 62-17-5(F)(1) in a manner similar to its use in Section 62-17-5(F)(2). It is considered "a normal rule of statutory construction to interpret identical words used in different parts of the same act as having the same meaning." *State v. Jade G.*, 2007-NMSC-010, ¶ 28, 141 N.M. 284, 154 P.3d 659 (brackets, internal quotation marks, and citation omitted). We therefore presume that the phrase is used in parallel in both Subsections (F)(1) and (F)(2) of Section 62-17-5. We also note that Section 62-17-3 explains that the EUEA's purpose is, in part, to remove "regulatory disincentives to public utility development of cost-effective energy efficiency and load management . . . in a manner that balances the public

interest, consumers' interests and investors' interests." We construe statutes so as to "effectuate the legislative intent—the purpose or object—underlying the statute." *Helman*, 1994-NMSC-023, ¶ 23. The phrase "remove regulatory disincentives" in Section 62-17-5(F)(2) must be interpreted in light of the purpose of the EUEA.

{28} We therefore agree with the Commission that "remove regulatory disincentives" in Section 62-17-5(F)(2) means to "remove regulatory disincentives or barriers for public utility expenditures on energy efficiency and load management measures in a manner that balances the public interest, consumers' interests and investors' interests," Section 62-17-5(F)(1). But this construction does not change the meaning of Section 62-17-5(F)(2) with respect to the type of decoupling mechanism required. The statute still states that regulatory disincentives to energy efficiency and load management shall be removed "*through* the adoption of a rate adjustment mechanism that ensures that the revenue per customer approved by the commission . . . is recovered by the public utility without regard to the quantity of electricity or natural gas actually sold." Section 62-17-5(F)(2) (emphasis added). This requisite element can only be met by a full revenue decoupling mechanism. Moreover, we note that full revenue decoupling essentially seeks to eliminate a utility's incentive to sell more energy as a means to increase revenue. RAP, *Revenue Regulation* 2. Thus, full revenue decoupling is consistent with the legislative intent

20

to "remove regulatory disincentives," even though it may additionally insulate a utility's revenue collections from other business risks. *Id.* 11, 35. The language of the statute is therefore clear with respect to the type of mechanism therein described, namely, a full revenue decoupling mechanism.

{29} The Commission nevertheless asks us to reject the plain language of Section 62-17-5(F)(2) as absurd and contradictory. PNM has suggested that the Commission will have no power to modify a full revenue decoupling mechanism proposed under Section 62-17-5(F)(2) but that the Commission is to assume that the Legislature has already balanced the interests of the public, consumers, and investors by mandating full revenue decoupling. The Commission asserts that PNM's interpretation would essentially strip the Commission of its power to balance these interests in setting just and reasonable rates. The Commission insists, however, that it must be given this power, as such balancing is required by both the EUEA and the PUA. The Commission suggests that partial revenue decoupling is a permissible harmonizing solution to a supposed quandary, allowing the Commission to both approve a decoupling mechanism and conduct this necessary balancing of interests. On the other hand, appellants CCAE and REIA assert that full revenue decoupling is compatible with this balancing of interests because "the Commission can (and

21

should) still determine whether" any proposed full revenue decoupling mechanism "will result in a just and reasonable rate."

{30} We agree with CCAE and REIA. The plain language of Section 62-17-5(F)(2) can be applied harmoniously with the balancing requirements and the just and reasonable standard of the PUA and EUEA. Consistent with our analysis of the statutory language, we specifically reject any interpretation of Section 62-17-5(F)(2) that strips the Commission of its power to ensure that a proposed full revenue decoupling mechanism balances the interests of the public, the consumers, and the utility's investors and results in just and reasonable rates. If we accept PNM's interpretation limiting the Commission's regulatory powers, then we have to either read Section 62-17-5(F)(2) in isolation or assume that, in enacting the statute, the Legislature intended to repeal the balancing standards at the heart of the EUEA and PUA by mere implication. But we do not read statutes in isolation. *Pub. Serv. Co. of N.M.*, 1999-NMSC-040, ¶ 23 ("In ascertaining legislative intent, the provisions of a statute must be read together with other statutes in pari materia under the presumption that the legislature acted with full knowledge of relevant statutory and common law." (internal quotation marks and citation omitted)). Further, "repeals by implication are not favored," *Citizens for Fair Rates & the Env't v. N.M. Pub. Regul. Comm'n*, 2022-NMSC-010, ¶ 65, 503 P.3d 1138 (brackets, internal quotation marks,

22

and citation omitted), and the "legislative intent to repeal a prior statute must be clear and manifest," *State v. Sena*, 2023-NMSC-007, ¶ 25, 528 P.3d 631 (internal quotation marks and citation omitted). The Legislature has not clearly expressed an intent to repeal the balancing language of the EUEA or the just and reasonable standard of the PUA, and thus Section 62-17-5(F)(2) does not work the repeal by implication that PNM suggests.

{31}     Indeed, as the Commission recognizes, interpreting Section 62-17-5(F)(2) to compel the Commission to approve a full revenue decoupling mechanism simply on petition by an interested utility—with no consideration of the interests affected by the mechanism or its effect on rates—would drastically transform the nature of the Commission's power over public utilities under the EUEA and the PUA. But there is no indication that the Legislature intended such a drastic transformation by mandating approval of a full revenue decoupling mechanism in Section 62-17-5(F)(2). Rather, the history of the statute confirms that the Legislature clearly intended for the Commission to have the power to balance the interests of the public, consumers, and investors before approving any full revenue decoupling mechanism. *See Vest*, 2021-NMSC-020, ¶ 34 (explaining that in construing the intent of a statute, we may "rely on the language of the statute as passed and the history of the statute insofar as any amendments may have been made").

{32} The EUEA was first enacted in 2005. 2005 N.M. Laws, ch. 341, §§ 1-11. At the time of its enactment, the EUEA's stated purpose was to encourage utilities to "include cost-effective energy efficiency and load management investments in their energy resource portfolios" and to eliminate "regulatory disincentives" to utility investments in energy efficiency and load management. 2005 N.M. Laws, ch. 341, § 3; § 62-17-3 (2005). In pursuit of this purpose, the 2005 version of Section 62-17-5(F) directed the Commission to "identify any disincentives or barriers that may exist for public utility expenditures on energy efficiency and load management and, if found, ensure that they are eliminated in order that public utilities are financially neutral in their preference for acquiring demand or supply-side utility resources." 2005 N.M. Laws, ch. 341, § 5(F).

{33} In 2008, the Legislature amended the purpose of the EUEA to provide that regulatory disincentives to the development of energy efficiency and load management were to "be removed in a manner that balances the public interest, consumers' interests and investors' interests" and that the Commission must give utilities an opportunity to earn a profit on energy efficiency and load management. 2008 N.M. Laws, ch. 24, § 4; § 62-17-3 (2008). The Legislature also amended Section 62-17-5(F) to emphasize that the Commission was to remove regulatory

24

disincentives to utility expenditures on energy efficiency and load management in a manner that balances stakeholders' interests:

> The commission shall, upon petition or its own motion, identify regulatory disincentives or barriers for public utility expenditures on energy efficiency and load management measures *and ensure that they are removed in a manner that balances the public interest, consumers' interests and investors' interests*. The commission shall also provide public utilities an opportunity to earn a profit on cost-effective energy efficiency and load management resource development that, with satisfactory program performance, is financially more attractive to the utility than supply-side utility resources.

2008 N.M. Laws, ch. 24, § 6(F); § 62-17-5(F) (2008) (emphasis added). In *Att'y Gen.*, 2011-NMSC-034, ¶¶ 13, 15, we explained that the EUEA's balancing requirements mirrored the PUA's requirement: "Every rate made, demanded or received by any public utility shall be just and reasonable." Section 62-8-1. We likewise noted that any rate approved under the EUEA fell within the PUA's broad definition of a "rate." *See Att'y Gen.*, 2011-NMSC-034, ¶¶ 11, 15; *see also* § 62-3-3(H) (defining "rate" as "every rate, tariff, charge or other compensation for utility service rendered or to be rendered by a utility and every rule, regulation, practice, act, requirement or privilege in any way relating to such rate, tariff, charge or other compensation and any schedule or tariff or part of a schedule or tariff thereof"). We therefore "read the EUEA in harmony with the PUA to conclude that when the [Commission] sets a rate, the Legislature intended the balancing requirement of the

25

EUEA to be the same as the balancing done under the PUA to determine just and reasonable rates." *Att'y Gen.*, 2011-NMSC-034, ¶ 15.

{34}   The Legislature substantially revised Section 62-17-5(F) to its present form in 2019 and 2020. 2019 N.M. Laws, ch. 202, § 2; 2020 N.M. Laws, ch. 17, § 1. Notably, in amending Section 62-17-5(F), the Legislature kept the balancing requirements of the 2008 version of the statute in Section 62-17-5(F)(1). Also importantly, in making these amendments, the Legislature did not amend the stated policy of the EUEA. Thus, Section 62-17-3 still provides that the purpose of the EUEA is to remove regulatory disincentives to utility expenditures in energy efficiency and load management "in a manner that balances the public interest, consumers' interests and investors' interests."

{35}   We generally presume that the Legislature is well informed about existing law when it enacts or amends a statute. *State v. Wilson*, 2021-NMSC-022, ¶ 64, 489 P.3d 925. In substantially amending Section 62-17-5(F) to its present form, the Legislature did not amend the balancing requirements of the EUEA or the just and reasonable standard of the PUA. Our holding in *Att'y Gen.*, 2011-NMSC-034, ¶ 15, thus extends to any rate sought under the EUEA, including any rate adjustment mechanism sought under Section 62-17-5(F)(2). The Commission must balance the interests of the public, consumers, and investors before approving a full revenue

decoupling mechanism under Section 62-17-5(F)(2) by ensuring that the mechanism will result in just and reasonable rates.

{36} Unlike the Commission, we do not view full revenue decoupling as inconsistent or incompatible with this balancing of interests and the setting of just and reasonable rates. We have repeatedly emphasized that whether a rate is just and reasonable depends on whether the rate falls within the zone of reasonableness between utility confiscation and ratepayer extortion. *See Att'y Gen.*, 2011-NMSC-034, ¶¶ 13, 18-19. We have found nothing in the record or regulatory literature cited by the parties which suggests that the Commission or utilities will be unable to meet this standard with a full revenue decoupling mechanism in place. For example, even with the adoption of a full revenue decoupling mechanism, the Commission must still calculate and approve a utility's revenue requirement in a way that balances the interests of ratepayers and the utility's investors and ensures just and reasonable rates. *See PNM Gas*, 2000-NMSC-012, ¶¶ 6-8; RAP, *Revenue Regulation* 9 ("With decoupling there is no change in the rate case methodology . . . . Initial prices are still set by the regulator, based on a computed revenue requirement."). Similarly, the Commission must also consider relevant policy factors and interests in allocating the utility's revenue collections among the ratepayer classes and in designing rates. *See Mountain States*, 1977-NMSC-032, ¶¶ 27, 73 (noting that "there is a great measure

of public policy that enters into the apportionment of rates" and listing factors relevant to rate design); RAP, *Revenue Regulation* 24-30 (discussing policy considerations in relation to rate design with a decoupling mechanism). Full revenue decoupling will ensure that the utility collects the amount of revenue that the Commission has approved for the utility to collect, no more and no less. RAP, *Revenue Regulation* 11. We are certain that the Commission and utilities will be able to apply Section 62-17-5(F)(2) in a way that balances the interests of the public, consumers, and investors and is consistent with the duty to set just and reasonable rates.

{37} The Commission rejected the plain language of Section 62-17-5(F)(2) because it believes that full revenue decoupling will radically shift utility regulatory policy by eliminating the usual business risks attendant to a public utility's operations. A full revenue decoupling mechanism will insulate a utility from revenue losses caused by a variety of factors, including losses due to energy efficiency and load management, weather fluctuations, global pandemics, or other economic shifts. RAP, *Revenue Regulation* 11, 35. We express no opinion about these potential policy implications. However, the Commission's policy concerns do not provide a valid basis on which to reject the clear directives of our Legislature. *See Sandel*, 1999-NMSC-019, ¶ 28; *see also State ex rel. Egolf v. N.M. Pub. Regul. Comm'n*,

2020-NMSC-018, ¶ 33, 476 P.3d 896. "[W]hile the New Mexico Constitution delegates to the Commission the exclusive responsibility for carrying out public utility regulatory policy, the parameters of that policy are, in the first instance, for the Legislature to decide." *Citizens for Fair Rates*, 2022-NMSC-010, ¶ 45.

{38} We therefore hold that the Commission may review the reasonableness of any full revenue decoupling mechanism proposed under Section 62-17-5(F)(2). A utility petitioning for the mechanism will bear the burden to show that the proposed mechanism will result in just and reasonable rates. Section 62-8-7(A). If the Commission finds the proposed mechanism to be unjust or unreasonable, then the Commission may modify the mechanism or deny the utility's Section 62-17-5(F)(2) petition as provided for in Section 62-8-7(D). *See Albuquerque v. N.M. Pub. Serv. Comm'n*, 1993-NMSC-021, ¶ 23, 115 N.M. 521, 854 P.2d 348 (explaining that Section 62-8-7(D) "sets forth the procedure to be followed when the Commission determines that a proposed rate is unjust or unreasonable"). We similarly emphasize that the utility must prove that the mechanism will "remove regulatory disincentives or barriers for public utility expenditures on energy efficiency and load management measures." Section 62-17-5(F)(1), (2); § 62-17-3. We understand this proof to require the utility to demonstrate that rate regulation has created disincentives or barriers to the utility's expenditures in energy efficiency and load management that

29

will be alleviated through the adoption of a full revenue decoupling mechanism. The utility may not prove its need for the mechanism based on revenue losses due to other factors or business risks. Further, Section 62-17-5(F)(2) contemplates that the Commission will approve a revenue per customer to be collected by the mechanism "in a general rate case proceeding." We therefore clarify that a petition for a full revenue decoupling mechanism under Section 62-17-5(F)(2) should be tied to a general rate case.

## IV.   CONCLUSION

{39}   In Section 62-17-5(F)(2), the Legislature has clearly expressed an intent to permit a utility to petition for a full revenue decoupling mechanism that will remove regulatory disincentives or barriers to utility expenditures in energy efficiency and load management in a manner that balances the public interest, consumers' interests, and investors' interests. We can see no injustice, absurdity, or contradiction in that clearly expressed legislative intention. We therefore vacate and annul the Commission's declaratory order due to its unlawful and unreasonable construction of Section 62-17-5(F)(2).

{40}   **IT IS SO ORDERED.**

_____
**MICHAEL E. VIGIL, Justice**

30

**WE CONCUR:**

_____

**DAVID K. THOMSON, Chief Justice**

_____

**C. SHANNON BACON, Justice**

_____

**JULIE J. VARGAS, Justice**

_____

**BRIANNA H. ZAMORA, Justice**